## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Oxygenator Water Technologies, Inc., | No. 20-cv-00358 (KMM/DJF) |
| Plaintiff, | |
| v. | **ORDER** |
| Tennant Company, | **\*\* FILED UNDER SEAL \*\*** |
| Defendant. | |

---

This case centers around three patents that involve the production of tiny bubbles of oxygen in water via electrolysis. Plaintiff Oxygenator Water Technologies, Inc. ("OWT") alleges that Tennant Company ("Tennant") infringes these patents through its manufacture and sale of commercial floor scrubbers. ECF 9. Tennant denies infringement and asserts that OWT's patents are invalid. ECF 44. Presently before the Court is OWT's Motion for Summary Judgment that its patents are not invalid and for Summary Judgment of Infringement. ECF 604. For the following reasons, OWT's motion is **GRANTED** in part and **DENIED** in part.

### I.    Background

The factual and procedural background of this case is laid out in the Court's separate Order on Tennant's Motion for Partial Summary Judgment. That discussion is incorporated

here by reference and will not be repeated in full. However, the Court will briefly recite those background issues of significance to OWT's motion.

OWT, a Minnesota corporation, owns several patents on flow-through oxygenators and methods of oxygenating flowing water. ECF 9 (Am. Compl.). Tennant, also a Minnesota corporation, manufactures and sells commercial floor scrubbers. ECF 620 (Tennant's Mem. in Supp. of Summ. J.) at 4.[1] Some of Tennant's scrubbers are equipped with electrolysis modules, which, according to Tennant, facilitate cleaning through the creation of microscopic bubbles in water without the use of floor cleaning chemicals. *Id*. OWT alleges that Tennant's electrolysis modules infringe US Patent Nos. RE45,415 (the "'415 patent"), RE47,092 (the "'092 patent"), RE47,665 (the "'665 patent") (collectively, the "Asserted Patents"). ECF 9.

The Asserted Patents are part of a family. The '092 patent is a continuation of the '665 patent, which is itself a continuation of the '415 patent. The '415 patent is a reissue of U.S. Patent No. 7,670,495 (the "'495 patent"). *See, e.g.*, ECF 632-4 ('415 patent). All three of the Asserted Patents share the same specification (the "Shared Specification") and claim priority to the same original patent applications filed in 2003. *See* ECF 606 (OWT's Mem. in Supp. of Summ. J.) at 8.

On August 5, 2021, this Court held a claim construction hearing (ECF 154), and several disputed terms were construed in a subsequent written order (ECF 162) (hereafter the "*Markman* Order"). Among those were constructions of two terms of significance to

---

[1] Page number citations throughout this order are made to the docketed page number, found at the top of the document in reference.

the pending motion: "water" and "nanobubbles." "Water" was construed as "[a]ny aqueous medium that can support the electrolysis of water." *Markman* Order at 20. "Nanobubbles" was construed as meaning "[a] bubble with a diameter less than that necessary to break the surface tension of water." *Id*. at 23. The term "water" appears in claims of all three Asserted Patents, while the term "nanobubbles" only appears in claims of the '415 and '092 patents. *See id*. at 3–4.

Tennant has alleged various invalidity defenses since the outset of this litigation. *See* ECF 44 (Answer) at 85–86. Tennant's invalidity efforts included petitioning the Patent Trial and Appeal Board ("PTAB") for *inter partes* review ("IPR") of the '415 patent before. This Court entered a stay in this litigation on October 7, 2021, after the PTAB agreed to institute IPR on one of Tennant's petitions. *See* ECF 420. On August 17, 2022, the PTAB concluded that Tennant had failed to show by a preponderance of the evidence that the challenged claims of the '415 patent were unpatentable (*see* IPR2021-00625 at 2), and the parties thereafter informed the Court that they were prepared to proceed with the remainder of fact discovery and expert discovery (*see* ECF 558).

On November 29, 2022, Tennant's technical expert, Dr. Henry S. White ("Dr. White"), provided a preliminary report on the alleged invalidity and unenforceability of the Asserted Patents (hereafter "Dr. White's Opening Report" or "White Op. Rep."). In this report, he opined that each of the Asserted Patents was invalid for one or more reasons, including lack of written description, indefiniteness, obviousness, and under the doctrine of intervening rights. *See generally* ECF 652-1 at 46–128. On January 24, 2023, OWT's technical expert, Dr. Seth Miller ("Dr. Miller"), provided a rebuttal to Dr. White's

invalidity opinions (hereafter "Dr. Miller's Rebuttal Report" or "Miller Reb. Rep."). ECF 628. Dr. White then provided a reply to Dr. Miller's rebuttal on February 13, 2023 (hereafter "Dr. White's Reply Report" or "White Reply Rep."). ECF 652-3.

On April 14, 2023, OWT filed the pending motion, seeking summary judgment as to three of Tennant's invalidity defenses. Specifically, OWT seeks an order from this Court finding that claims of the Asserted Patents reciting "nanobubbles" are not invalid under 35 U.S.C. § 112 for lack of written description or indefiniteness and that claims of the '092 and '665 patents would not have been obvious in light of the prior art cited by Tennant. *See generally* ECF 606. Tennant opposes. *See* ECF 647 (Tennant's Opp. to Summ. J.). OWT also asks for entry of summary judgment of infringement of the '092 and '665 patents, according to a stipulation between the parties. ECF 606 at 34–35.

## II.    Applicable Legal Standards

### A.  Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Dowden v. Cornerstone Nat'l Ins. Co.*, 11 F.4th 866, 872 (8th Cir. 2021). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of

admissible evidence, that specific facts exist creating a genuine issue for trial. *Id.* at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Irvin v. Richardson*, 20 F.4th 1199, 1204 (8th Cir. 2021).

### B.  Summary Judgment of No Invalidity

Invalidity of a patent "is an affirmative defense that can preclude enforcement of a patent against otherwise infringing conduct." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015) (internal quotations omitted). Invalidity is a high bar, however, as patents issued by the United States Trademark and Patent Office ("USPTO") carry a statutory presumption of validity. 35 U.S.C. § 282(a). An accused infringer must prove invalidity defenses by clear and convincing evidence to overcome the presumption of patent validity.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 85 (2011).  A "moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence on an essential element of a defense upon which a reasonable jury could invalidate the patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

### III.    Analysis

Tennant challenges the validity of all three Asserted Patents under several different theories. In the pending motion, OWT asks the Court to find that claims reciting "nanobubbles" are not invalid for lack of written description or indefiniteness pursuant to 35 U.S.C. § 112. OWT also asks the Court to find that claims of the '092 and '665 patent are not obvious in light of the prior art cited by Tennant pursuant to 35 U.S.C. § 103. Tennant opposes, arguing that genuine issues of material fact preclude summary judgment on all three defenses. For the following reasons, the Court finds that the patents are not invalid due to lack of a written description or obviousness. However, there are genuine fact issues that preclude such a determination on the issue of indefiniteness.

### A.    Validity

#### 1.    Written Description

Tennant maintains that claims 13, 18, 24, and 26 of the '415 patent and claim 26 of the '092 Patent, each reciting the claim term "nanobubbles,"[2] are invalid for lack of written description because the Shared Specification fails to disclose sufficient detail such that a person of ordinary skill in the art ("POSA") would conclude that the inventor was in possession of the claimed nanobubbles. *See* White Op. Rep. ¶ 95. OWT now seeks summary judgment on this defense, arguing that the claims and the Shared Specification "indisputably disclose" an invention involving the creation of nanobubbles and that

---

[2] Specifically, the challenged claim elements are "a suspension comprising oxygen microbubbles and nanobubbles" for Claims 13, 18, 24, 26 of the '415 Patent and "where the oxygen produced comprises nanobubbles" for claim 26 of the '092 Patent.

Tennant's arguments regarding a lack of written description are simply based on doubt that nanobubbles are actually created by the claimed invention. *See* ECF 606 at 15.

A patent's specification must contain "a written description of the invention." 35 U.S.C. § 112(a). To satisfy this requirement, a patent application must show that the applicants were in "possession" of the invention in question. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991); *see also Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."). District courts addressing validity challenges under the written description requirement acknowledge that possession can be difficult to define, but ultimately must determine whether a patent's specification describes an invention that is understandable to a skilled artisan. *See Vanda Pharms. Inc. v. Roxane Lab'ys, Inc.*, 203 F. Supp. 3d 412, 430 (D. Del. 2016), *aff'd sub nom. Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*, 887 F.3d 1117, 1137 (Fed. Cir. 2018). As the Federal Circuit has explained:

> The hallmark of written description is disclosure. The standard for satisfying the written description requirement is whether the disclosure allows one skilled in the art to visualize or recognize the identity of the subject matter purportedly described. There is no requirement that the disclosure contain either examples or an actual reduction to practice; rather, the critical inquiry is whether the patentee has provided a description that in a definite way identifies the claimed invention in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing. That assessment requires an objective inquiry into the four corners of the specification.

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1190–91 (Fed. Cir. 2014) (cleaned up). "'Compliance with the written description requirement is a question of fact, but is

amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the nonmoving party.'" *Streck, Inc. v. Rsch. & Diagnostic Sys.*, 665 F.3d 1269, 1287 (Fed. Cir. 2012) (quoting *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008)). "[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*   Here, the Court concludes that no reasonable fact finder would conclude that the Shared Specification fails to provide a sufficiently "definite" and "detail[ed]" identification of the claimed nanobubbles necessary for a POSA to have identified possession. *Alcon*, 745 F.3d at 1190–91.

The invention is described in plain terms from the outset. The abstract of the Shared Specification reads: "[A]n oxygen emitter which is an electrolytic cell is disclosed. When the anode and cathode are separated by a critical distance, very small microbubbles and nanobubbles of oxygen are generated. The very small oxygen bubbles remain in suspension, forming a solution supersaturated in oxygen." See ECF 608-1 at 3 ('415 patent abstract). The Shared Specification further explains that bubble size was a significant limiting factor in prior efforts to oxygenate water, and that the "most common method" of oxygenating water produced "large bubbles" that would "simply break the surface and [be] discharged into the atmosphere." *Id.* 1:57–61. The disclosed invention instead "generates very small" "nanobubbles" that would be "too small to break the surface tension of the medium, resulting in a medium supersaturated with oxygen." *Id.* 2:66–3:3.

The Shared Specification acknowledges that "bubbles in the nanometer range could not be resolved" (or in other words, measured). *Id.* 5:60–6:2. Because the nanobubbles

could not be definitively measured, the Shared Specification identifies how and why the inventor nevertheless believed they were generated. *Id.* 4:14–15 (explaining that the nanobubbles were too small to break the surface of water and therefore "remain[ed] suspended in the water, giving the water an opalescent or milky appearance"); *id.* 4:32–38 (explaining that the "bubbles remain suspended indefinitely in the fluid and, when allowed to build up, make the fluid opalescent or milky"); *id.* ("Only after several hours do the bubbles begin to coalesce on the sides of the container and the water clears."); *id.* 4:46–50 (explaining the electrolysis conditions necessary to produce the opalescent or milky suspension of nanobubbles described elsewhere).

OWT argues that these statements "unmistakably convey[] to a POSA that [the inventor] conceived of and described a method of creating a suspension comprising nanobubbles." ECF 606 at 18. The Court agrees. The written description requirement is met if "the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described." *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1366 (Fed. Cir. 2019) (quoting *Alcon*, 745 F.3d at 1190–91). The technology in this case is relatively simple, a fact that Tennant effectively relies upon to challenge OWT's infringement theories under the doctrine of equivalents. Here, on the issue of written description, the simplicity of the disclosure cuts in OWT's favor because the reader can quickly and readily connect the content of the patents' claims to the description of the invention in the Shared Specification. This is consistent with the Court's approach during claim construction, when it adopted OWT's preferred construction of "nanobubble" as

merely "a bubble with a diameter less than that necessary to break the surface tension of water." *Markman* Order at 23. As the Court explained about the Shared Specification:

> The first sentence of the specification's definition of "nanobubble" is clearly definitional. It says what the word "means" and identifies a verifiable characteristic: "a diameter less than that necessary to break the surface tension of water." The second sentence describes a consequence of that characteristic in the natural world. Because nanobubbles cannot break the surface tension of water, they "remain suspended" and eventually "giv[e] the water an opalescent or milky appearance." In other words, the second sentence explains how a nanobubble acts, while the first sentence contains the patentee's definition of the term."

*Id*. at 21 (internal citations omitted and cleaned up).

The clarity that guided this Court's claim construction also informs its conclusion here. The relevant, asserted claims recite a method for producing "nanobubbles" via an electrolysis emitter. The specification amply describes these bubbles, in terms of what they are (bubbles too small to break the surface tension of water), what they do (remain suspended in fluid for hours because they are too small to break the surface tension of the water), and how they would appear (when their surrounding fluid takes on an opalescent or milky appearance). This goes beyond Tennant's characterization of the specification as merely "includ[ing] the word 'nanobubbles.'" ECF 647 at 16. And in the Court's view, it does more than enough to allow the skilled reader to recognize the claimed invention in the corresponding description.

Tennant's opposition reveals a deep skepticism that a POSA would believe (or could independently verify) that the inventor of the Asserted Patents had actually created the claimed nanobubbles. *See, e.g.*, *id*. at 19 ("[A] POSA would not believe from reading OWT's specification that the inventor was in possession of nanobubbles, or a suspension

of nanobubbles, absent data or evidence, which the specification does not provide."); *id*. at 18–19 (summarizing Dr. White's opinion that at the time of the invention, bulk nanobubbles were not documented in the art and therefore a POSA would reject that opalescent or milky water indicated the presence of nanobubbles); *id*. at 17–18 (noting that the specification concedes that the claimed sub-micron nanobubbles had not actually been measured); *id*. at 18 (summarizing Dr. White's opinion that the "absence of any testing or analysis would be evidence to a POSA that the inventor did not possess nanobubbles at the time of the invention"); *id*. (summarizing Dr. White's opinion that larger bubbles could also create opalescence and milkiness and therefore casting doubt that the observation of these things suggested the presence of nanobubbles).

But this skepticism does not carry Tennant's burden of showing clear and convincing evidence that the Asserted Patents are invalid for lack of written description. At times, Tennant's skepticism verges on tautology. *See*, *e.g.*, *id*. at 18–19 (arguing that a POSA would not believe a patent describes the invention of bulk nanobubbles because bulk nanobubbles were not yet invented). More critically, Tennant's position appears to run contrary to the case law. Tennant cites no case for the proposition that even well-supported skepticism that a patent accomplishes what it says it accomplishes indicates a deficiency in that patent's written description, let alone a deficiency that would amount to clear and convincing evidence of invalidity. This dearth of support in the case law makes sense, because written description "is not about whether the patentee has proven to the skilled

reader that the invention works, or how to make it work, which is an enablement[3] issue." *Alcon*, 745 F.3d at 1191; *accord Centrak*, 915 F.3d at 1366.

The cases cited by Tennant do not change the Court's assessment. Some of these cases appear to involve a different situation, where there is tension between a narrow description and broad claims. *See, e.g.*, *Capon v. Eshhar*, 418 F.3d 1349, 1358 (Fed. Cir. 2005) (addressing a "question of whether the specifications adequately support the breadth of all of the claims that are presented"). But the issue here is not whether the patent claims some broad genre of "bubbles" but describes only "nanobubbles." Other cited cases address a scenario in which the claimed invention is abjectly different than what was disclosed in the specification. *See, e.g.*, *Zoho Corp. v. Sentius Int'l, LLC*, 494 F. Supp. 3d 693, 707 (N.D. Cal. 2020) (claims required "textual source material stored in an electronic database" but the "specification consistently refers to the textual source material without suggesting that it is stored in a database"). But here, the Court sees no such facial incongruity; for example, the patent does not claim nanobubbles generated by electrolysis while describing nanobubbles created by some other means. Finally, some cases address a scenario where there is a contradiction between what is described in the patent and what is also asserted

---

[3] Enablement is another requirement of a patent specification under the patent statute. *See* 35 U.S.C. § 112(a) (a patent "specification shall contain a written description of the invention, *and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same*") (emphasis added). Enablement is a second and separate requirement from written description. *See Ariad Pharms.*, 598 F.3d at 1345 (Fed. Cir. 2010) ("[O]ne describes an invention, and, if the law's other requirements are met, one obtains a patent. The specification must then, of course, describe how to make and use the invention (*i.e.*, enable it), but that is a different task."). Enablement is not before the Court in this case.

by the patent applicant to be well-known as true in the art. *See, e.g., Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) ("[W]hen the four corners of the specification directly contradict information that the patentee alleges is 'well-known' to a person of skill at the effective filing date, no reasonable jury could conclude that the patentee possessed the invention."). Again, this is not such a case. This patent specification does not rely upon any assertion about what is known about nanobubbles, one way or the other. To the extent that Tennant believes that the application implicitly relies upon such an assertion in the sense that it assumes nanobubbles exist at all, it offers no evidence that such an implicit assertion is "directly contradicted" by something in the specification.

Consequently, the Court concludes that Tennant has failed to adduce clear and convincing evidence such that a reasonable fact finder could conclude that the patent is invalid for lack of written description of the claim term "nanobubbles." Summary judgment is therefore granted on this aspect of invalidity.

## 2. Indefiniteness

Tennant also maintains that claims 13, 18, 24, and 26 of the '415 patent and claim 26 of the '092 patent are invalid as indefinite because a POSA would not understand the scope of the claimed "nanobubbles" with reasonable certainty, in light of this Court's construction of the term "water." *See* White Op. Rep. ¶ 113. OWT seeks summary judgment to the contrary, claiming that there is no indefiniteness in the claim language because there is no genuine dispute about the size of a nanobubble, under the Court's construction of the term, nor about whether a POSA could determine if such bubbles have been created after performing the claimed methods. *See* ECF 606 at 20. The Court

ultimately concludes that summary judgment is inappropriate because there is a material and genuine fact dispute underlying the indefiniteness question.

A patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b). When "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention," they are indefinite. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). "[A] patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (cleaned up). Only claims that are "not amenable to construction" or "insolubly ambiguous" are indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations omitted), *abrogated on other grounds by Nautilus*, 572 U.S. 898. Where, as here with "nanobubbles," a patent's claims involve words of "degree," the Federal Circuit has explained:

> Definiteness problems often arise when words of degree are used in a claim. That some claim language may not be precise, however, does not automatically render a claim invalid. The question becomes whether one of ordinary skill in the art would understand what is claimed when the claim is read in light of the specification.

*BJ Servs. Co. v. Halliburton Energy Servs., Inc.*, 338 F.3d 1368, 1372 (Fed. Cir. 2003) (quoting *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984). "Indefiniteness is a question of law . . . subject to a determination of underlying facts." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1343 (Fed. Cir. 2016) (internal citations omitted); *see also Datamize, LLC*, 417 F.3d at 1347 ("A determination

of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.") (citations and internal quotation marks omitted).

Tennant's theory of indefiniteness goes like this: Alongside its construction of "nanobubbles," this Court also construed the term "water" in the patent claims as meaning "any aqueous medium that can support the electrolysis of water." ECF 162 at 20. Dr. White opines that "nanobubbles" is rendered indefinite in light of this construction of "water," "because a POSA would not be able to determine whether or not a given method would produce nanobubbles, and thus would not understand the scope of these claims with reasonable certainty." White Op. Rep. ¶ 113; *see also id*. ¶ 137. This is because, according to Dr. White, the surface tension of water is variable and contingent "on many factors, including temperature, the salt content or hardness of the water, and whether there are hydrophobic substances (like detergents) in the water." *Id*. ¶ 117; *see also id*. ¶¶ 117–25 (summarizing other evidence concerning the effect of water conditions on the formation of nanobubbles). In other words, a "diameter less than that necessary to break the surface tension of water" is not a fixed diameter and is therefore indefinite. *See, e.g.*, *id*. ¶ 116; *see also id*. ¶ 135 ("[I]f an 'opalescent or milky' appearance is indicative of nanobubbles or a suspension of nanobubbles . . . the claims reciting 'nanobubbles' are indefinite because an 'opalescent or milky' appearance will occur under some water conditions, but and [sic] will not occur under other water conditions."). As such, Dr. White concludes that "a POSA would not know whether or not performing a particular method in a particular water composition infringed the asserted claims . . . until after the method was performed, and

the POSA could examine the size and properties of the bubbles that were generated." White Reply Rep. ¶ 26.

OWT argues that it is nonetheless entitled to summary judgment on indefiniteness for several reasons. OWT argues that Tennant has failed to advance "clear and convincing evidence that any water property would affect bubble size enough to create uncertainty and establish indefiniteness." ECF 671 at 18. OWT contends that both parties' technical experts have been able to understand with reasonable certainty the size of bubbles that meet the patent's definition of nanobubbles. ECF 606 at 21–24. And OWT argues that, as a matter of law, claims reciting "nanobubbles" are not indefinite even if a user only knows whether a method produces nanobubbles after performing that method. *Id*. at 24–25 (citing *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35 (Fed. Cir. 2020)). In response, Tennant argues that it has introduced evidence on variations in water surface tension that is relevant to its indefiniteness theories, and that to the extent that OWT disagrees with that evidence, such a disagreement should not be adjudicated on summary judgment. *See, e.g.*, ECF 647 at 27. Tennant also contends that OWT misstates Tennant's actual position on indefiniteness, which is not about whether experts "would understand what size bubbles could meet the functional 'nanobubbles' definition," but rather that "a POSA would understand that whether or not a given method produced nanobubbles, and thus was within the claims, would depend on the water composition." *Id*. at 26. Tennant further argues that the *Nevro* holding cited by OWT is inapplicable to the facts of this case, and points towards different case law to support its position. *Id*. at 32–33 (citing *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008)).

As a threshold matter, the Court notes that if indefiniteness in this case hinged entirely on whether variations in water quality can affect the formation of nanobubbles as construed by this Court, then Tennant has clearly marshalled enough evidence to survive summary judgment. While OWT attempts to diminish Tennant's evidence concerning the effect of water conditions as unpersuasive (*see, e.g.*, ECF 671 at 18 ("None of [Tenant's] evidence shows that [water] variability has a meaningful effect on the creation of nanobubbles, and therefore does not suggest that there is uncertainty about the scope of the claim.")), this misses the point. Tennant's indefiniteness argument is not that water conditions affect the formation of "nanobubbles" in some specific way that renders the claim term indefinite, but rather that water conditions affect surface tension, generally, which means that a "bubble with a diameter less than that necessary to break the surface tension of water" could be different sizes under different water conditions. *See, e.g.*, ECF 647 at 29 (arguing that "differences in size, properties and ability to break the surface tension observed in visible bubbles under the varying water conditions tested would also be observed in nanobubbles, because the physics governing nanobubbles and larger bubbles are the same"). This makes sense because, as discussed above in the Court's analysis of written description, the term nanobubbles is closely defined in the Shared Specification by its relationship to water. The Court therefore disagrees that Tennant's evidence concerning the effect of water conditions on surface tension lacks relevance to indefiniteness in this case. To the extent that OWT believes that Tennant's evidence is subjectively unconvincing, the Court agrees with Tennant that this suggests the existence of a fact dispute that is inappropriate for resolution on summary judgment.

However, even if Tennant can prove that the surface tension of water varies with water condition, this does not necessarily indicate indefiniteness in "nanobubbles." In the *Nevro* case cited by OWT, the Federal Circuit considered whether "claims recit[ing] parameters for a system or device configured to generate a 'paresthesia-free' signal" were indefinite because said signal would be paresthesia-free in some patients but not in others. 955 F.3d at 39. The answer was no. The court first explained that the specification taught "how to generate and deliver the claimed [paresthesia-free] signals using the recited parameters" by specifying the frequency and amplitudes that would produce them. *Id*. Significantly, it was "undisputed that 'paresthesia,' as used in the asserted patents, means "a sensation usually described as tingling, pins and needles, and numbness" and further "undisputed that a skilled artisan would be able to quickly determine whether a signal creates paresthesia for any given patient." *Id*. (internal citations and quotations omitted). Consequently, the court held that the fact that "a given signal will eliminate paresthesia in some patients, but not others, does not render the claims indefinite." *Id*. at 39–40. In reaching this decision, the court went on to expressly reject the argument that a claim was indefinite "because infringement can only be determined after using the device or performing the method." *Id*. at 40 ("Definiteness does not require that a potential infringer be able to determine *ex ante* if a particular act infringes the claims.").

The factual parallels between *Nevro* and this case are clear. Take, for example, claim 13 of the '415 patent, one of those challenged as indefinite in Dr. White's opinion. The claim, in its entirety reads:

13. A method for producing an oxygenated aqueous composition comprising:

flowing water at a flow rate no greater than 12 gallons per minute through an electrolysis emitter comprising an electrical power source electrically connected to an anode electrode and a cathode electrode contained in a tubular housing,

causing electricity to flow from the power source to the electrodes, and,

producing the composition comprising a suspension comprising oxygen microbubbles and nanobubbles having a bubble diameter of less than 50 microns, wherein:

> the anode electrode is separated at a critical distance from the cathode such that the critical distance is from 0.005 inches to 0.140 inches;

> the power source produces a voltage no greater than about 28.3 volts and an amperage no greater than about 13 amps,

> the tubular housing has an inlet and an outlet and a tubular flow axis from the inlet to the outlet;

> the water flows in the inlet, out the outlet, is in fluid connection with the electrodes, and the water flowing into the inlet has a conductivity produced by the presence of dissolved solids such that the water supports plant or animal life.

Similar to *Nevro*, this claim recites a device and method configured to generate an oxygenated suspension containing "nanobubbles" (a functional outcome, much like paresthesia-free) via a specified electrolysis signal. And like the patent in *Nevro*, the claim teaches "how to generate and deliver the claimed signal[] using the recited parameters," here by setting electrodes at specified distances, flowing water along specified paths, and inputting power at specified amperages. Therefore, if it is undisputed what a "nanobubble" means in the patent, and if is undisputed that a skilled artisan could determine whether

performing the claimed method has created such nanobubbles, then under *Nevro*, summary judgment of no indefiniteness would be proper.

Here, there appears to be no real dispute over what "nanobubble" means, according to the patent. While Dr. White expresses doubt about this Court's "functional definition" of "nanobubble" as being "a bubble with a diameter less than that necessary to break the surface tension of water" (*see* White Op. Rep. ¶ 64 (opining that "[t]his sort of functional definition, which I understand derives from the Patents-in-Suit, is unusual . . . ." and favoring an objective definition based on actual measurement of a bubble's size)), this definition of nanobubbles was largely agreed to[4] by both parties during claim construction. *See Markman* Order at 20 (explaining that the patent is clear and the parties "agree that a nanobubble is 'a bubble with a diameter less than that necessary to break the surface tension of water'")). The Court's construction of "nanobubble" was a legal determination based on the patent itself, and Tennant "cannot transform into a factual matter the internal coherence and context assessment of the patent simply by having an expert offer an opinion on it." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015). In any event, notwithstanding Tennant's position regarding water conditions, both Dr. White and OWT's technical expert appear to be broadly in agreement that a bubble with a diameter less than that necessary to break the surface tension of water is generally one that is "submicron" or "below a micron" in size. *See* ECF 606 (quoting deposition of testimony

---

[4] Tennant also sought additional wordage, taken from the patent, that the Court declined to adopt. *See* ECF 162 at 20. Regardless, both parties agreed on the portion of the construction, eventually adopted by the Court, that reads "a bubble with a diameter less than that necessary to break the surface tension of water." *Id*.

of both technical experts). As such, there is no meaningful dispute over the meaning of "nanobubbles" according to the patent.

However, there is plainly a dispute about whether a POSA could determine, even after performing the claimed method, whether nanobubbles had been created. *See, e.g.*, 647 at 30 (summarizing Dr. White's opinion that "even if a POSA performed the claimed methods, they could not determine whether the methods produced nanobubbles or a suspension of nanobubbles") (internal citations omitted). OWT argues that there is no genuine dispute of fact on this point because even if Dr. White opines that a POSA could not make such a determination, his other testimony says otherwise. *See* ECF 671 at 14 (citing Dr. White's Reply Report and deposition testimony, suggesting that a POSA could measure the "size and properties" of bubbles generated after performing the claimed method to determine if they were "nanobubbles."). But the Court disagrees with OWT.

As discussed in the Court's analysis of written description, the Shared Specification of the Asserted Patents describes certain evidence that nanobubbles were formed. *See* 608-1 4:14–15 (explaining that because nanobubbles were too small to break the surface of water they therefore "remain[ed] suspended in the water, giving the water an opalescent or milky appearance"); *id*. 4:32–38 (explaining that the "bubbles remain suspended indefinitely in the fluid and, when allowed to build up, make the fluid opalescent or milky"); *id*. ("Only after several hours do the bubbles begin to coalesce on the sides of the container and the water clears."). The Court has found that the patent's description of the formation of an opalescent or milky suspension that remained in water for several hours is a sufficient disclosure of "nanobubbles" to satisfy the written description requirement. This

is because the Court has concluded that a POSA's lack of certainty, or even skepticism, that nanobubbles are actually created by performing the claimed method, does not determine whether the Shared Specification conveys possession. But it is a different question on indefiniteness, because OWT's best argument for summary judgment requires that a POSA be able to determine whether the claimed nanobubbles have been created. Simply put, if OWT wishes to argue that definiteness does not require a POSA to know in advance whether the performance of a given method will produce nanobubbles, then, as in *Nevro*, there needs to be *no dispute* that such a POSA would know whether nanobubbles have been created after the fact. But on that point, there is clearly still dispute.

For instance, in his Reply Report, Dr. White summarizes his opinion about a POSA's ability to determine the formation of nanobubbles after performing the claimed method:

> I also disagree with Dr. Miller's opinion that "it is straightforward to determine whether or not nanobubbles are formed" because a POSA could "directly observe whether bubbles remained in the water for a significant amount of time." As I explained in my Opening Report, the smallest bubble a human eye can see without aid of a microscope is around 50 microns. Therefore, a POSA could not directly observe whether nanobubbles had formed when the claimed methods were performed in a particular type of water. To the extent Dr. Miller's reference to direct observation refers to the water turning opalescent, milky or cloudy, I disagree that this would indicate to a POSA that nanobubbles were present, for the reasons I explain above and in my Opening Report.

Reply Report ¶ 25 (internal citations omitted). To get around this testimony, OWT points to other statements made by Dr. White that suggest his understanding that the presence of nanobubbles can, in fact, be tested after performing a given method. *See* ECF 671 at 14

(quoting Dr. White's deposition testimony and his opinion at paragraph 26 of his Reply Report that "a POSA would not know whether or not performing a particular method in a particular water composition infringed the asserted claims of the '415 patent **until after the method was performed, and the POSA could examine the size and properties of the bubbles that were generated**") (emphasis original).

However, the Court disagrees that Dr. White has contradicted himself across these statements or at least that there has been a contradiction of importance. Dr. White's opinion is that a POSA, at the priority date claimed by the Asserted Patents[5], would not associate the opalescent or milky suspension with the formation of nanobubbles (*see, e.g.*, ECF 614

---

[5] The three Asserted Patents claim priority to the same original application filed in 2003. The briefing hints at, though does not directly address, the question of whether indefiniteness is considered only from the perspective of the perspective of a POSA in 2003, rather than a POSA in present day. Invalidity is typically considered in light of evidence available at the time of a patent's filing. For example, compliance with the written description requirement depends on whether the inventor has shown they were in possession of it at the time of filing and "is judged based on the state of the art as of the priority date." *Amgen, Inc. v. Sanofi*, 872 F.3d 1367, 1373 (Fed. Cir. 2017). Likewise, prior art that renders a patent invalid is art that is in existence at the time of filing. *See* 35 U.S.C. § 102(a)(1) ("A person shall be entitled to a patent unless the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention[.]") (cleaned up). Where post-filing date evidence is considered in the validity context, it is typically where that evidence undermines, rather than supports, claims made by the patentee at the time of filing. *See, e.g.*, *Amgen*, 872 F.3d at 1375 ("Appellants purportedly sought to introduce post-priority-date evidence showing that Appellees engaged in lengthy and potentially undue experimentation to enable the full scope of the claims. Such evidence could have been relevant to determining if the claims were enabled as of the priority date and should not have been excluded simply because it post-dated the claims' priority date."). Having found no clear authority to the contrary, the Court assumes without deciding that whether the claimed "nanobubbles" are indefinite is determined from what a POSA would have known or could have determined as of the filing date.

(Dr. White Dep. Tr.) 86:2–10). This opinion is not in contradiction with, for example, Dr. White's testimony that, despite his skepticism about the existence of nanobubbles at all, theoretical means of looking for them in an electrolysis medium do exist:

> Q. So after the electrolysis was conducted, would a person of skill be able to tell whether they made nanobubbles or not?
>
> A. It's a hypothetical, because as I've stated repeatedly, I don't think they would exist; they would dissolve so quickly. I would -- so given that, if you had nano particles, solid nano particles, there would be techniques to determine them such -- we talked about dynamic light scattering, one -- to provide evidence.

ECF 614 110:3–14 (intervening objection omitted); *see also id.* 87:8–16 (discussing "skepticism" about the use of dynamic light scattering to detect nanobubbles in electrolysis experiments, specifically). The common thread in Dr. White's opinions is that whether or not some means of detecting nanobubbles exists, a POSA would have been unable to determine whether they had created nanobubbles using the claimed method in the Asserted Patents because a POSA would not understand that the Shared Specification had provided any means to test for nanobubbles. To the extent that OWT believes that it has better evidence to the contrary, this is not for the Court to adjudicate on summary judgment.

As such, the Court finds that there are disputes of material fact over the effect of water conditions on the surface tension of water and whether a POSA could discern the presence of nanobubbles after performing the claimed method, one or both of which must be resolved before indefiniteness may be determined as a matter of law. Summary judgment of no indefiniteness is therefore denied.

### 3. Non-obviousness

Tennant also maintains that claims 23, 27, 31, 60-61, 63-64 of the '092 Patent are invalid as obvious in light of a combination of two pieces of prior art, while claims 13, 16, and 55 of the '665 patent are invalid as obvious in light of the same combination, plus one additional prior art reference. *See* White Op. Rep. at 81, 105. OWT seeks summary judgment of non-obviousness as to each of the asserted claims of the of the '092 Patent and '665 patent on two grounds. First, OWT argues that all of the asserted claims of the '092 and '665 patents[6] recite a specific "flow path" that is not shown in the two prior art references cited by Tennant and that Tennant has failed to show why a POSA would be motivated to combine those references to include such a flow path. *See* ECF 606 at 27–33. Second, OWT argues that Tennant has failed to show why a subset of asserted claims of the '092 and '665 patents requiring input of voltage less than 28.3 volts are obvious in view of Tennant's prior art. *Id*. at 33–34.

A claim is unpatentable for obviousness when "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.

> A party asserting that a patent is obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.

---

[6] OWT asserts claims 23, 26–27, 31, 60–61, 63–64 of the '092 patent. *See* ECF 606 at 12. The asserted claims of the '665 patent are claims 13, 16, and 25. *Id*.

*PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1193 (Fed. Cir. 2014) (quoting *In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012)). The ultimate determination of obviousness under § 103 is a question of law based on underlying factual findings. *In re Baxter Int'l, Inc.*, 678 F.3d 1357, 1361 (Fed. Cir. 2012) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966)). These underlying factual considerations consist of: (1) the "level of ordinary skill in the pertinent art,"[7] (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." [8] *KSR*

---

[7] Here, there does not appear to be any substantive dispute over the level of ordinary skill in the art between the parties relevant to this inquiry.

[8] While the experts disagree on whether secondary considerations (or objective indicia) support a conclusion of non-obviousness of the '092 and '665 patents (*see* White Op. Rep at 119–21; Miller Reb. Rep. at 113–20), OWT does not assert that secondary considerations are relevant to the pending motion. However, the Federal Circuit has explained that fact-finding on the issue of secondary considerations of non-obviousness is always important. *See Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1353 (Fed. Cir. 2013) (explaining that summary judgment of obviousness or non-obviousness without addressing secondary considerations is susceptible to remand). Here, secondary considerations do not add support to OWT's motion. Dr. Miller opines on two objective indicators of non-obviousness: copying and licensing. As to licensing, Dr. Miller cites two licenses and one sublicense taken to parent patents of the Asserted Patents. *See* Miller Reb. Rep. ¶¶ 195–96. The Court concludes that three licenses executed before the issuance of the '092 and '665 patents is not a meaningful indicator of the non-obviousness of the patents. As for copying, while Dr. Miller presents evidence that Tennant procured and copied a commercial embodiment of OWT's patented technology (*see* Miller Reb. Rep. ¶¶ 188–93), Dr. White opines that Tennant's testing of the product in question never amounted to copying it (*see* White Reply Rep. ¶¶ 65–67). This dueling expert testimony presents a factual dispute not amenable to summary judgment, and therefore the Court concludes that, for the purposes of deciding the pending motion, the copying alleged by Dr. Miller cannot operate as an objective indicator of non-obviousness of the '092 and '665 patents.

*Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham*, 383 U.S. at 17–18). Whether a person of ordinary skill in the art would have had a motivation to combine the teachings of prior art references is also a question of fact. *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353 (Fed. Cir. 2012). Therefore, to survive summary judgment of non-obviousness premised on a lack of motivation to combine, the party challenging the validity of a patent must adduce evidence that would allow a reasonable jury to find "by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so." *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*, 752 F.3d 967, 973 (Fed. Cir. 2014) (internal quotations omitted).

### *A Flow Path Without Passing Between Electrodes of Opposite Polarity*

OWT first seeks summary judgment of non-obviousness based on a common claim element reciting a specific flow path of water in relationship to electrodes. OWT argues that the claims reciting this limitation are not rendered obvious by the two primary references cited by Tennant: U.S. Patent No. 6,251,259 ("Satoh") and U.S. Patent No. 5,378,339 ("Aoki"). Both Satoh and Aoki disclose electrolysis emitters. Satoh discloses a water electrolysis device capable of maintaining desirable "oxidation-reduction potential" and pH levels. *See* ECF 608-11 (Satoh) 1:28–55. Aoki discloses a compact water electrolyzer of increased efficiency over previous inventions. *See* ECF 608-12 (Aoki) 1:41–44.

Tennant's theory of obviousness is that a POSA would have been motivated to combine these two references to achieve the invention claimed by the patents. OWT argues

that it is entitled to summary judgment of non-obviousness because neither Satoh nor Aoki teach a water flow path in which water may flow without passing between electrodes of opposite polarity, as the asserted claims of the '092 and '665 patents require, and because Tennant has failed to articulate a motivation to combine Satoh and Aoki in a way that results in that claimed flow path. The Court agrees. First, the record shows there is no dispute that neither Satoh nor Aoki teach the feature at issue. Second, the Court finds that Tennant has failed to produce evidence addressing the obviousness of combining Satoh and Aoki to include a feature that is taught by neither.

Each asserted claim of the '092 and '665 patents recites (or depends upon a claim that recites) a requirement for a flow path for water that does not pass between electrodes of opposite polarity. For example, independent claims 27 and 60 of the '092 patent recite an oxygenation chamber with electrodes arranged in such a way that "water may flow without passing between electrodes of opposite polarity." ECF 608-2 13:59–60, 17:37–39. Claim 13 of the '665 patent includes similar language, requiring the positioning of electrodes such that "at least some water may flow from the water inlet to the water outlet without passing through a space between electrodes of opposite polarity." ECF 608-3 11:50–56. OWT provides an annotated figure from the Shared Specification depicting this claimed flow path:



*See* ECF 606 at 28 (Fig. 7 of the Shared Specification with annotations by OWT).

According to OWT, the "orientation and location of the electrodes and the flow path of the water through the electrolysis cell" is an "important feature" of the '092 and '665 patents, and "positioning these electrodes to the outside of the electrolysis chamber with space in the middle of the chamber that water could flow through without passing between the electrodes" was understood to be helpful in the creation of microbubbles and nanobubbles. *Id*. at 27–28. Tennant attempts to cast doubt on the significance of this flow path arrangement by noting that OWT "cites nothing in the record" that would support its importance. *See* ECF 647 at 35 n.7. However, Tennant also cites no evidence to suggest the opposite (that is, that the claimed water path arrangement is *not* an important feature). Every word of a claim has meaning. *See, e.g.*, *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) ("We must give meaning to all the words in Exxon's claims."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a bedrock

principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (internal quotations omitted); *In re Sabatino*, 480 F.2d 911, 913 (C.C.P.A. 1973) ("Claim limitations defining the subject matter of the invention are never disregarded."). As such, the Court assumes that the flow path arrangement is recited across numerous claims of the '092 and '665 patents because it is a meaningful limitation defining the scope of the claimed invention.

With that in mind, there appears to be no real dispute about the "scope and content of the prior art," because neither Satoh nor Aoki show the claimed feature of a water flow path that does not pass between electrodes of opposite polarity. OWT argues this point explicitly and identifies diagrams in each reference that depict water flow paths where the water flows exclusively *between* electrodes of opposite polarity. *See* ECF 606 at 29–30. Tennant does not dispute this characterization of Satoh and Aoki in its briefing, nor does anything in Dr. White's written opinions suggest he believes that the references teach a flow path that does not pass between electrodes of opposite polarity. Indeed, during his deposition, Dr. White agreed that it was his understanding that all of the water in Satoh and Aoki flows between electrodes of opposite polarity. ECF 614 134:25–135:25.

Tennant nevertheless argues that a POSA would be motivated to combine Satoh and Aoki in such a way that would result in that claimed flow path. The relevant case law is unsettled as to whether the Court can even consider motivation to combine in this case, with at least one holding by the Federal Circuit suggesting the answer is no. *See PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014) ("[W]e consider motivation to combine … only 'if all the elements of an invention are found in a

combination of prior art references.'") (quoting *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1164 (Fed. Cir. 2006)). Other guidance is seemingly to the contrary. *See Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016) ("A claimed invention may be obvious even when the prior art does not teach each claim limitation, so long as the record contains some reason why one of skill in the art would modify the prior art to obtain the claimed invention."), *overruled on other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017). Given this ambiguity, the Court assumes without deciding that the obviousness of a claim can be established where the alleged prior art fails to disclose all of the claim's limitations but where a POSA is nevertheless motivated to combine the art in such a way that includes features not taught by those references.[9]

While neither Satoh nor Aoki teach a flow path exactly like that found in claims of the '092 and '665 patents, they both teach distinctive flow paths, defined by different electrode arrangements. According to OWT, Satoh flows water through an area between an internal electrode and an outer electrode of opposite polarities. ECF 606 at 29. In Aoki, OWT describes the path as between "concentric electrodes [] located to the outside of a cylindrical housing," where the electrolysis nevertheless "occurs by directing water through the space between electrodes of opposite polarity." *Id*. These descriptions are broadly consistent with those advanced by Tennant, which contrasts Satoh's "rod-like electrode design" with the "concentric electrode arrangement" and central flow path of

---

[9] The fact that neither Satoh nor Aoki show each claim limitation of the '092 and '665 patents is at least indicative of "differences between the prior art and the claims at issue" under the factual inquiry presented in *KSR*. 550 U.S. at 406.

Aoki. ECF 647 at 36; *see* White Op. Rep. ¶ 145 ("Aoki teaches that a more efficient electrolysis cell may be made using electrodes structured as concentric cylinders that contact the water.") (internal quotations omitted). Tenant contends that its evidence supports the theory that a POSA would be motivated to combine these disparate electrode designs to reach an electrode arrangement with the flow path claimed in the '092 and '665 patents. According to Tennant, "Dr. White explained that using the electrode configuration of Aoki with the device disclosed in the Satoh patent would result in an area for water to flow without passing between electrodes of opposite polarity." ECF 647 at 35. He also explained "why a POSA would be motivated to combine these references. In particular, Dr. White opined that a POSA would have looked to analogous art, such as Aoki, to determine the optimal arrangement of electrodes." *Id*. at 35 (internal quotations omitted).

It is true that Tennant's arguments and the citations therein present a motivation-to-combine analysis, by explaining why a POSA would take certain elements of Satoh and certain elements of Aoki to reach an obvious combination of both. On this point, there is no doubt that Tennant has met its burden. However, OWT's position on summary judgment is not that Dr. White has failed to explain *any* motivation to combine Aoki and Satoh, but rather that, beyond conclusory statements otherwise, he has failed to explain why a person would be motivated to combine the references to include a relationship between water flow path and electrode placement (*i.e.*, water that never passes between electrodes of opposite polarities) that is neither taught nor suggested by either reference. According to OWT,

> Much of Tennant's brief argues that Dr. White provided a rationale for why a POSA would modify Satoh using the teachings of Aoki. While OWT disagrees with Tennant's position, for the purposes of this motion OWT does

> not challenge that general motivation. Instead, OWT's motion is based on the fact that—absent hindsight—Dr. White could not identify any motivation to combine the disclosures of Satoh and Aoki in the particular way claimed by the '092 and '665 patents (i.e., with a path for water to flow without going between electrodes).

ECF 671 at 20. Having carefully reviewed Dr. White's written opinions and his testimony, the Court agrees with OWT.

Take, for example, the paragraphs of Dr. White's Opening Report cited by Tennant as evidencing a motivation to combine Satoh and Aoki. *See* ECF 647 at 35-36 (citing White Op. Rep. ¶¶ 186-89). Dr. White first acknowledges that Satoh "does not expressly teach" the claimed flow path of the '092 and '665 patents. White Op. Rep. ¶ 186. He then opines that a POSA "would have looked to analogous art, such as Aoki, to determine the optimal arrangement of electrodes," because Satoh's rod-like electrode pattern has certain disadvantages that are improved by Aoki's concentric pattern. *Id*. ¶¶ 187–88. He concludes by stating that "[w]hen using the concentric electrode arrangement of Aoki . . . substantially all points midway between electrodes . . . would be closer to a surface of Satoh's tubular housing than to a center point within the tubular housing and so that at least some water may flow from the water inlet to the water outlet without passing through a space between electrodes of opposite polarity." *Id*. ¶ 189. Here, while Dr. White clearly articulates an opinion as to why a POSA would combine Satoh and Aoki to create an electrolysis device, his statements provide no substantive explanation for *why* that combination would include a new flow path and electrode arrangement like the one claimed in the '092 and '665 patents. At most, Dr. White's opinion seems to be that the specific

claimed flow path would of course result from the combination, but to the extent this is his opinion, he does not explain it.

The relevant paragraphs of Dr. White's Reply Report cited by Tennant do not improve on this deficiency. *See* ECF 647 (citing White. Reply Rep. ¶¶ 46-47). In these paragraphs, Dr. White first argues that OWT's expert "misunderstands my argument concerning the combination of Satoh and Aoki," before reiterating that "a POSA would be motived to apply the concentric electrode arrangement of Aoki to the electrolysis chamber of Satoh, *and in doing so would arrive* at the electrode arrangement, including an open center, as in the relevant asserted claims." White Reply Rep. ¶ 46 (emphasis added). Dr. White then again explains why a POSA would be motivated to modify Satoh to use the concentric electrode arrangement of Aoki because Aoki teaches certain disadvantages of Satoh's rod-like electrodes. *Id.* ¶ 47. In these statements, Dr. White once more focuses on explaining the motivation to combine Satoh and Aoki, while once again jumping ahead to ("in doing so would arrive") the specific outcome seen in the '092 and '665 patents of a flow path defined by not passing between electrodes of opposite polarity.[10]

Dr. White's deposition testimony does not meaningfully elucidate his opinion on this issue, either. Again, much of Dr. White's testimony focuses on the opinion that a POSA would be motivated to combine Satoh and Aoki, generally. *See, e.g.*, ECF 614 119:1–7

---

[10] To be sure, in opposing the pending motion, Tennant does not argue that the claimed flow path of the '092 and '665 patents is inherently obvious in view of the cited prior art. *See PAR Pharm.*, 773 F.3d at 1194–95 (explaining that the doctrine of "inherency may supply a missing claim limitation in an obviousness analysis" but only where the missing limitation at issue is the "natural result flowing from" the combination of prior art elements) (quoting *In re Oelrich,* 666 F.2d 578, 581 (C.C.P.A. 1981).

(describing inefficiencies in Satoh and improvements taught by Aoki); *id*. 122:12–24 (discussing the advantages of the electrode geometry of Aoki over Satoh). When pressed, however, for why it would be obvious for a POSA to combine Satoh and Aoki but change the flow paths taught in each reference to the flow path claimed in the '092 and '665 patents, Dr. White failed to cite any motivation other than that evidenced by the existence of the Asserted Patents themselves. *Id*. 124:3–4 ("I presume the inventor was motivated by the reasons he describes in his patent."); *see also id*. 131:3–21 (referring the questioner to the '415 patent for motivation to create the flow path of the '415 path). Tennant attempts to downplay this testimony as being a "single exchange where Dr. White mentioned the '415 patent and could not recall the other opinions set forth in his reports." ECF 647 at 37. But while the Court agrees that Dr. White's testimony must be properly contextualized, the context is no better for Tennant. Dr. White's circularity of reasoning back to the Asserted Patents themselves simply highlights the absence of any real theory as to why a POSA would combine the cited prior art but add the specific, claimed feature found in neither.

Ultimately, "[t]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." *PAR Pharm.*, 773 F.3d at 1196. But where the evidence "fails to explain why a person of ordinary skill in the art would have combined elements from specific references in the way the claimed invention does" then a legal conclusion of non-obviousness by the Court is proper. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (emphasis removed). Here, Tennant has adduced evidence demonstrating a dispute of material fact as to whether a POSA would have been motivated to combine Satoh and Aoki, but has failed to offer

evidence for why a POSA would combine the references to include the specific water flow path claimed in each of the asserted claims of the '092 and '665 patents. The Court therefore concludes that each of the asserted claims are non-obvious in view of Satoh and Aoki, and summary judgment is granted for OWT. *See KSR*, 550 U.S. at 427 ("Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate."); *see also Cheese Sys., Inc.*, 725 F.3d at 1354 (affirming district court's summary judgment of non-obviousness where the court found that cited prior art failed to disclose a specific panel orientation claimed by the patent-in-suit and where the patent-in-suit offered the only motivation to combine the panel arrangement of the prior art to include the orientation by the patent).

### *A Voltage of Less Than or Equal to 28.3 Volts*

OWT also argues for summary judgment of non-obviousness as to Claims 23, 26-27, 31 of the '092 patent and claims 13 and 16 of the '665 patent because Tennant has failed to show that a POSA would have been motivated by Satoh to use the voltage levels recited in these claims. *See* ECF 606 at 33–34. While the Court has already concluded that each of these claims is non-obvious over Tennant's prior art because of the flow path issue, discussed above, the voltage issue presents a potential second and independent reason to find these claims are non-obvious in view of the same prior art. However, on the voltage issue, the Court finds that factual disputes remain that would preclude summary judgment and will briefly discuss its reasoning.

36

Claims 23, 26-27, 31 of the '092 patent and claims 13 and 16 of the '665 patent each recite (or depend from a claim that recites) a power source with voltage "less than or equal to 28.3 volts." *See, e.g.*, ECF 608–2 14:6–7. OWT argues that the obviousness opinion advanced in Dr. White's Opening Report assumes that a POSA would combine a particular embodiment of Satoh (shown at the Satoh patent's Fig. 11) with aspects of Aoki, as discussed above. ECF 606 at 33. But, according to OWT, Dr. White's opinion looks to *other* embodiments in Satoh to find the teaching of a power input of less than 28.3 volts. *Id*. Moreover, Dr. White does so without explaining how or why it would have been obvious for a POSA to do so. *Id*. Then, OWT argues, Dr. White's Reply Report takes a new approach by offering an opinion that a POSA would believe that the embodiment at Fig. 11 was meant to operate at 12 volts. *Id*. OWT characterizes this 12-volt opinion about Fig. 11 as being objectively wrong. *Id*. at 34 (arguing that Satoh instructs that the embodiment at Fig. 11 should be operated at 30 volts). Tennant, on the other hand, maintains that Dr. White's reading of Satoh is correct and that a disputed issue of material fact remains. ECF 647 at 38. Specifically, Tennant argues that "Dr. White's opening and reply reports are consistent and rely on the same disclosures in Satoh for the 'less than or equal to 28.3 volts' limitation." *Id*. Tennant further characterizes the question of whether Fig. 11 discloses using a 12 volt power source is a "typical fact dispute." *Id*.

On this issue, the Court agrees that disputes of material fact remain that would preclude summary judgment if not for the Court's ruling on the flow path issue. Here, Dr. White has identified multiple places in Satoh that he asserts explicitly teach the application of voltage of less than or equal to 28.3 volts, as claimed in the '092 and '665 patents. *See*

White Op. Rep. ¶ 176. This is manifestly different than the scenario of the flow path, where Dr. White offers no opinion that the path claimed in the '092 and '665 patents is disclosed in the prior art, at all. To the extent that OWT believes that Dr. White has failed to *adequately* explain a POSA's motivation to combine Satoh's teachings of varying voltages to reach the claimed voltage of less than or equal to 28.3 volts, this presents the "pure question of fact" contemplated by *PAR Pharm*. 773 F.3d at 1196. The Court also agrees with Tennant that whether a POSA would believe that Satoh's embodiment at Fig. 11 teaches the application of 12 volts or 30 volts is a fact dispute that would be properly submitted to a jury. That this factual dispute appears to be objectively resolvable, does not render it immaterial or less than genuine for the purposes of summary judgment.

### B.  Summary Judgment of Infringement

Separately, OWT seeks summary judgment of infringement of various claims of the Asserted Patents by certain Tennant floor-cleaner products pursuant to a stipulation agreed to by Tennant. ECF 606 at 34–35; *see* ECF 603 (stipulation). Tennant does not oppose this portion of OWT's motion, subject to its remaining invalidity defenses, as expressly reserved in the stipulation. ECF 647 at 41. Judgment will therefore be entered accordingly.

### IV.    Order

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1.  OWT's Motion for Summary Judgment of Infringement and No Invalidity (ECF 604) is **GRANTED in part and DENIED in part**;

2.  The Motion is **GRANTED** to the extent that the Court grants Summary Judgment that Claims 13, 18, 24, and 26 of the '415 patent and Claim 26 of the '092 Patent are not invalid for lack of written description.

3.  The Motion is further **GRANTED** to the extent that the Court grants Summary Judgment that claims 23, 26–27, 31, 60–61, 63–64 of the '092 patent and claims 13, 16, and 25 of the '665 patent are non-obvious in light of U.S. Patent No. 6,251,259 ("Satoh") and U.S. Patent No. 5,378,339 ("Aoki").

4.  The Motion is further **GRANTED** to the extent that the Court grants Summary Judgment that, consistent with a stipulation reached between the parties (ECF 603), Tennant's ec-H2O modules infringe claims 60-61, 63-64 of the '092 patent and Claim 55 of the '665 patent and Tennant's ec-H2O modules that receive a 24-volt DC input signal, or the methods performed by these products, infringe claims 13, 18, 24, and 26 of the '415 patent, claims 23, 26–27, 31, 60–61, 63, and 64 of the '092 patent, and claims 13, 16, and 55 of the '665 patent.

5.  The Motion is otherwise **DENIED**.

Date: March 28, 2024                         *s/ Katherine M. Menendez*
                                             Katherine M. Menendez
                                             United States District Judge