UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Oxygenator Water Technologies, Inc.,

                    Plaintiff,

v.

 Tennant Company,

                   Defendant.

Case No. 20-cv-00358 (KMM/DJF)

**ORDER**

---

Before the Court are two post-trial motions: Defendant Tennant Company's ("Tennant") Motion for Judgment as a Matter of Law ("JMOL") and for a New Trial (ECF 893), and Plaintiff Oxygenator Water Technologies' ("OWT") Motion for Attorney Fees Enhanced Damages, Interest, and Costs (ECF 902). For the reasons that follow, Tennant's motion is **DENIED**, while OWT's motion is **GRANTED in part** and **DENIED in part**.

### Background

The Court assumes the parties' familiarity with the facts and procedural history of this case and will provide only a brief summary here. This is a patent infringement case. Plaintiff Oxygenator Water Technologies ("OWT") is the owner of several electrolysis patents related to the production of very small micro- and nanobubbles in water. Tennant is a global manufacturer of floor-cleaning machines for commercial and industrial use. Many of Tennant's machines are equipped with a module that performs electrolysis, allowing the machine to clean floors without the use of detergents. OWT filed this lawsuit

in 2020, accusing componentry inside Tennant's modules of infringing claims in three patents: U.S. Patent Nos. RE45,415 ("the '415 patent"), RE47,092 ("the '092 patent"), and RE47,665 ("the '665 patent") (collectively, the "Asserted Patents"). This case has narrowed over the years since OWT filed suit. Significantly, on summary judgment, this Court found that a subset of Tennant's newer generation modules ("ec-H2O NanoClean modules") do not infringe the Asserted Patents. This left issues of infringement related to a different group of modules, referred to simply as "ec-H2O modules."

The Court held a jury trial in November 2024. The parties agreed in advance that there were three issues to be decided: (1) whether Tennant's ec-H2O modules containing a 36-volt battery[1] infringed claims 13, 18, 24, and 26 of the '415 patent; (2) whether Tennant's infringement (both contested and stipulated-to) was willful; and (3) the amount of damages that Tennant should pay for any infringement. ECF 786 (Def's Trial Br.) at 1; *see also* ECF 720 (Pl's Trial Br.) at 3–7 (identifying substantively the same issues). The parties worked constructively to resolve logistical issues ahead of time. In all, the Court fielded eight motions *in limine*, some of which it ruled on from the bench at the final pre-trial conference and others that it resolved by written order. *See* ECF 847 (Conf. Min. Entry); ECF 850 (Order).

---

[1] Before summary judgment, the parties stipulated that ec-H20 modules containing a 36-volt battery infringed a subset of claims asserted by OWT: these being claims 60, 61, 63, and 64 of the '092 patent, and claim 55 of the '665 patent. *See* ECF 603 at 2. The parties further stipulated that the 24-volt battery ec-H20 modules infringed all other claims asserted by OWT. *Id*.

Jury selection occurred on November 18, 2024, and opening arguments were made the same day. *See* ECF 874 (Trial Tr. Vol. I).[2] Trial proceeded over the following five days. The jury heard testimony from many witnesses, including several experts. Trial proceeded smoothly, with evidentiary disputes arising, particularly around the testimony of OWT's damages expert and whether his opinions impermissibly exposed the jury to information about Tennant's revenues beyond those relevant to the infringing aspects of its products. *See* discussion, *infra*, Section III.G.

At the close of OWT's case on the fourth day of trial, Tennant moved for judgment as a matter of law ("JMOL") of no willful infringement before Sept. 19, 2019, and of no indirect infringement before that same date. *See* Tr. 970:12–14. Tennant made a brief oral argument in support of this motion, followed by a short statement in opposition by OWT. The parties agreed that it was within the Court's discretion to defer ruling on the motion until after the trial, and that in doing so, the analytic framework would be the same as if the Court decided the matter on the spot. The Court ultimately decided that it would defer ruling and set a full briefing schedule after the conclusion of trial. *See id*. 977:12–14. At the close of its own case-in-chief, Tennant renewed its JMOL motion from the previous day, and also sought JMOL of no damages for overseas sales from 2015 to 2018, no damages for 2,800 particular units that formed part of OWT's expert's royalty base, no

---

[2] The trial transcript is broken out into six volumes at ECF 874–79. Pagination is continuous between the volumes. The Court will hereafter make citation to pages and lines of the entire transcript (hereafter, "Tr.") without reference to individual docket or volume numbers.

literal infringement of the '415 patent, and no infringement by the doctrine of equivalents for the '415 patent. *Id*. 1288:7–20, 1291:18–22, 1292:20–25. OWT, in turn, sought affirmative JMOL of infringement under the doctrine of equivalents. *Id*. 1295:4–8. The Court again deferred ruling in favor of full briefing following trial. *Id*. 1299:5–8.

The parties gave closing arguments on the morning of the sixth day of trial. The jury received the case shortly after noon, and returned a verdict about four hours later. *See* Tr. 1457:24–1458:1. The verdict was a complete win for OWT. The jury unanimously concluded that "Tennant's use of ec-H2O modules that contain a sparger installed on its 36-volt battery machines" infringed claims 13, 18, 24, and 26 of the '415 patent, both literally and under the doctrine of equivalents. *See* ECF 880 (Verdict Form) at 2. The jury also found that Tennant indirectly infringed each of those claims. *Id*. at 3. The jury awarded total damages of $9,815,595.[3] *Id*. at 4. Finally, the jury indicated its decision that Tennant

---

[3] The Court elected to use a verdict form that required jurors to "show their work" on damages. This decision was reached after considerable disagreement between the parties. OWT argued that jurors had broad discretion to fashion their own damages award and favored a verdict form that simply asked the jury to state a total amount, without disclosing the math behind their decision. Tennant advocated for a format that asked the jury to identify how many units infringed and the per-unit royalty for that infringement. The Court adopted Tennant's preferred approach after observing that both parties' evidence had overwhelmingly, if not exclusively, discussed damages in terms of a per-unit royalty rate; it could seed confusion, if not error, to suggest to jurors that they could reach a damages total that did not conform to the evidence. As such, the verdict of $9,815,595 was tallied, according to verdict form, on a finding of 18,558 infringing modules and a per-module royalty rate of $529. *See* ECF 880. The Court observes that 18,558 multiplied by $529 is actually $9,817,182. Neither party has noted this discrepancy, so the $9,815,595 figure will stand. To the extent that the jurors made a computational error, it is of very little significance, and any argument to the contrary by either party is now waived.

had willfully infringed the Asserted Patents, and that the willful infringement had begun in 2015. *Id*.

Following trial, Tennant filed the instant motion on JMOL, raising six issues: (1) no literal infringement of the '415 patent; (2) no infringement under the doctrine of equivalents of the '415 patent; (3) no willful infringement before 2019; (4) no contributory or induced infringement of the '415 patent; (5) no damages for 1,825 scrubbers sold overseas; and (6) no damages for 2,851 specific commercial floor scrubbers included in the jury's damages base. *See* ECF 893 at 1. In addition, Tennant moves for a new trial on three bases: first, that allowing the 2019 willful infringement to go to the jury tainted its verdict on other issues; second, on damages; and third, on infringement if the Court declines to grant JMOL. *Id*. Shortly following Tennant's post-trial motion, OWT filed its motion for enhanced willful infringement damages, "exceptional case" attorney fees, costs, and pre- and post-suit interest. A consolidated hearing was held on May 5, 2025. ECF 945.

## I.    Tennant's Motion for JMOL and for a New Trial

### A.    Legal Standard

"While Federal Circuit law governs substantive patent law, regional circuit law governs a district court's rulings on post-trial motions for JMOL and for a new trial." *Bombardier Recreational Prods., Inc. v. Arctic Cat Inc.*, 331 F. Supp. 3d 902, 906 (D. Minn. 2018) (citing *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010)), *aff'd,* 785 F. App'x 858 (Fed. Cir. 2019).

JMOL may be sought "at any time before the case is submitted to the jury" when "a party has been fully heard on an issue," and it may be granted when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). In weighing a JMOL motion, a Court must

> consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence.

*Arctic Cat*, 331 F. Supp. 3d at 907 (quoting *Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991) (quotation marks omitted).

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a)" before a case is submitted to the jury, then a party may renew its JMOL motion after trial. Fed. R. Civ. P. 50(b). "On a renewed JMOL motion, 'the law places a high standard on overturning a jury verdict because of the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused.'" *Speed RMG Partners, LLC v. Arctic Cat Inc.*, No. 20-CV-609 (NEB/LIB), 2023 WL 11960176, at *2 (D. Minn. July 25, 2023) (quoting *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 805 (8th Cir. 2017)). In such circumstances, "JMOL is appropriate only when there is 'no proof beyond speculation to support the verdict.'" *Id*. (quoting *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 932–33 (8th Cir. 1999)); *see Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) ("In reviewing a jury verdict, we draw every reasonable inference in favor of

the verdict and may not make credibility determinations or weigh the evidence.") (cleaned up). Stated plainly, "[a] jury verdict will not be set aside unless there is a complete absence of probative facts to support a verdict." *Fair Isaac Corp. v. Experian Info. Sols. Inc.*, 711 F. Supp. 2d 991, 997 (D. Minn. 2010) (quoting *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1158 (8th Cir. 2003)), *aff'd,* 650 F.3d 1139 (8th Cir. 2011).

The granting of a new trial under Rule 59 "is required only when necessary to avoid a miscarriage of justice." *Id.* at 997 (quoting *Gearin v. Wal–Mart Stores, Inc.*, 53 F.3d 216, 219 (8th Cir. 1995)). This includes scenarios "where the verdict is against the clear weight of the evidence, clearly excessive, or the result of passion or prejudice." *Jones v. Nat'l Am. Univ.*, 608 F.3d 1039, 1048 (8th Cir. 2010) (quoting *MacGregor v. Makllinkrodt, Inc.*, 373 F.3d 923, 930 (8th Cir. 2004)). "The authority to grant a new trial is within the discretion of the district court," *Arctic Cat*, 331 F. Supp. 3d at 907 (quoting *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996)), and one may be granted as to "all or some of the issues," Fed. R. Civ. P. 59(a)(1). But "a district court reviewing a motion for a new trial is 'not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because the court feels that other results are more reasonable.'" *Fair Isaac*, 711 F. Supp. 2d at 997 (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 186 (8th Cir. 1972)) (cleaned up); *see also Nat'l Presto Indus., Inc. v. U.S. Merchs. Fin. Grp., Inc.*, No. 18-CV-3321 (SRN/LIB), 2023 WL 7986605, at *5 (D. Minn. Nov. 17, 2023) ("A 'trial court may not grant a new trial simply

because the trial court would have found a verdict different from the one the jury found.'")
(quoting *Butler v. French*, 83 F.3d 942, 944 (8th Cir. 1996)).

### B.    Discussion

#### 1.    JMOL of No Direct Infringement

Tennant moves for JMOL of no direct infringement, either literally or under the doctrine of equivalents, of the asserted claims of the '415 patent, which require a power source that produces a voltage no greater than about 28.3 volts. Tennant argues that the undisputed evidence showed that the only voltage produced by its 36-volt battery machines was greater than 28.3 volts. *See, e.g.*, ECF 895 (Mem. in Supp. of JMOL) at 11. As for infringement under the doctrine of equivalents, Tennant argues that OWT's expert witness, Dr. Seth Miller, offered only a conclusory opinion, lacking the "particularized testimony and linking argument" that is required to prove the "insubstantiality of the differences between the claimed invention and the accused device." *Id*. at 14 (quoting *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, 119 F.4th 1355, 1371 (Fed. Cir. 2024)). The Court denies JMOL on direct infringement.

***Literal Infringement***: Each asserted claim of the '415 patent requires a "power source [that] produces a voltage no greater than about 28.3 volts."[4] The Court previously construed "power source" as "[e]lectrical and mechanical equipment and their interconnections used to generate and/or convert power." *See, e.g.*, ECF 162 ("*Markman*

---

[4] The relevant language appears in claim 13 of the '415 patent. Claims 18, 24, and 26 each depend on claim 13.

Order") at 4. At trial, OWT's theory of literal infringement was primarily advanced through the extensive testimony of Dr. Miller, who opined that the relevant "power source" in the accused modules was a battery and an electronic control board, working in tandem to produce a voltage of less than 28.3 voltage and therefore literally infringing the claims.

Dr. Miller testified at length about how the control board employed a technology known as pulse width modulation ("PWM") to very rapidly toggle a direct current of power from the battery on and off, to effectively "reduce the voltage from [36 volts] into something that's useful for creating the right number of microbubbles and nanobubbles so that you can get cleaning." Tr. 344:3–7. In essence, the literal infringement opinion presented by Dr. Miller characterized a PWM cycle, which he explained occurred 2,000 times a second, as being so fast that the ec-H2O electrolysis system never received power in excess of 28.3 volts nor perceived that it was receiving a pulsing flow of power. *Id*. 317:10–318:4. Instead, he calculated that the 36-volt battery's output was reduced to an "average voltage" of 2.5 volts, far below the upper limit set by the patent. *See, e.g.*, *id*. 314:12–24; 322:5–10.

Tennant's arguments for JMOL are two-fold. First, Tennant argues that no reasonable juror could have found that the power source described by Dr. Miller—one that toggles a 36-volt battery on and off—could literally infringe a claim that requires the power source to produce no more than 28.3 volts. ECF 895 at 9–11. Indeed, at trial, Tennant's technical expert, Dr. Henry White, testified that the voltage produced in the 36-volt ec-H2O modules was either "36 or nothing," and therefore in his opinion, plainly could not

satisfy the claim language requiring a power source that produces no more than 28.3 volts. *See id*. 1136:15–21. Second, Tennant argues that Dr. Miller's "average voltage" theory about PWM "misapplies the plain language of the asserted claims," which recite only "a voltage" and not any kind of calculated voltage. ECF 895 at 12–13. Essentially, Tennant argues that Dr. Miller's testimony and OWT's closing arguments improperly invited the jury to engage in *ad hoc* claim construction of the scope of "produces a voltage of no greater than 28.3 volts." *Id*. at 12–13.

But neither approach toward attacking the verdict succeeds. "Literal infringement requires that the accused device literally embodies every limitation of the claim." *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369 (Fed. Cir. 2009). "The jury's infringement determination is a question of fact reviewed for substantial evidence." *Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016). To the extent that Tennant simply argues that Dr. Miller's testimony that the 36-volt ec-H2O's power source literally met each limitation of the claims at issue was not "substantial evidence," the Court disagrees. Dr. Miller gave copious evidence in his testimony that the PWM system employed by the ec-H2O module's power source literally infringed the claims of the '415 patent because it never "produced" more than 28.3 volts. Tennant did not seek to exclude this testimony on any ground. Instead, it sought to undermine Dr. Miller's testimony on cross-examination and offered contrary evidence in support of its own theory that a power source with a 36-volt battery cannot be a power source that produces a voltage no greater than 28.3 volts. In other words, the jury heard

10

substantial evidence that could have supported either of two outcomes on infringement. The jury chose to believe Dr. Miller's testimony and find for OWT. It is not the Court's place to determine whether this was the best decision, to assess the credibility of the competing experts, or to reweigh the evidence. The only question is whether there was substantial evidence to support the jury's decision. There was.

Tennant's second argument, alleging improper claim construction by the jury, is more nuanced, but the Court's decision on JMOL is the same. Unlike infringement, "the ultimate question of construction is a legal question." *Eon Corp.*, 815 F.3d at 1318 (quoting *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 333 (2015)) (alteration omitted); *see O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("[A] dispute over the scope of the asserted claims is a question of law."). Although the Court construed "power source," the parties did not seek construction of the relevant claim language requiring that the power source "produces a voltage no greater than about 28.3 volts," and so these terms acquired their plain and ordinary meaning. Obviously, assigning the "plain and ordinary meaning" to any word or phrase does not magically resolve all ambiguity. Instead, the jury often has to grapple with what the ordinary meaning of a term is as it considers infringement. But this work is not automatically improper claim construction.

With that being said, if the Court believed that this jury impermissibly enlarged the scope of the asserted claim language at issue, then it would likely grant JMOL in Tennant's favor. However, there is no reason to believe that this is what occurred. As OWT accurately

observes, the asserted claims do not require any particular type of power source, only one that "produces a voltage no greater than about 28.3 volts." *See* ECF 918 (Opp. to JMOL) at 18–19. The jury heard that the accused modules contain a power source that uses PWM to regulate a 36-volt battery. The task given to them was not to construe either the breadth of "produces" or "a voltage of no greater than 28.3 volts," but rather to determine if the "voltage" "produce[d]" by the power source in the ec-H2O modules was "less than about 28.3 volts." Dr. Miller's testimony about "average voltage," and OWT's closing arguments using that same language, invited the jury to deliberate on the specific manner in which the PWM power source in Tennant's products produces a voltage. Tennant's belief that the jury was wrong to determine that, due to PWM, the "voltage produce[d]" by the power source in an ec-H2O is no greater than 28.3 volts is simply another disagreement about the jury's weighing of evidence. It is not an indication that the jury improperly expanded the scope of OWT's claims.

***Doctrine of Equivalents***: The jury in this case returned a verdict of both literal infringement and infringement under the doctrine of equivalents. The Court declines to grant JMOL on infringement under the doctrine of equivalents as well.

If an accused device does not literally infringe a claim, it may still infringe under the doctrine of equivalents if "the difference between the claimed invention and the accused product or method was insubstantial or [] the accused product or method performs the substantially same function in substantially the same way with substantially the same result

12

as each claim limitation of the patented product or method." *AquaTex Indus. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007).

> [A] patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. . . . Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*Id*. at 1329 (quoting *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed.Cir. 1996)) (internal quotation marks and emphasis omitted). Tennant argues that OWT failed to meet its evidentiary burden under either test. The Court disagrees.

As discussed above, Dr. Miller provided extensive testimony supporting his ultimate opinion that the ec-H2O modules with 36-volt batteries literally infringe claims 13, 18, 24, and 26 of the '415 patent. After doing so, Dr. Miller testified that, if the jury did not agree with his opinion on literal infringement, it could still find infringement under the doctrine of equivalents. This testimony concerning equivalent infringement was relatively brief compared with the testimony concerning literal infringement.

Tennant argues that Dr. Miller's testimony was too conclusory and failed to offer the requisite particularized testimony and linked argument to support a finding of infringement under the insubstantial-difference test, ECF 895 at 14, while further maintaining that Dr. Miller did not rely at all on the "function, way, result" test, *see id*. at

13

14 n.2.[5] OWT maintains that Dr. Miller provided ample testimony to support a finding of equivalent infringement under both.

The Court focuses on the insubstantial-difference test, where the disagreement between the parties concerns the sufficiency of Dr. Miller's testimony as opposed to whether he gave supporting testimony at all. According to Tennant, "Dr. Miller's entire testimony on his [insubstantial-difference] theory spanned less than two pages of the trial transcript and was woefully deficient." ECF 895 at 14. Tennant points to Dr. Miller's testimony concerning equivalent infringement and PWM, in which he stated that "when you're [switching a 36-volt current fast enough between on and off] . . . there is no difference" between that and a steady voltage of less than 28.3 volts. *See id*. at 15 (citing Tr. 354:12–16). According to Tennant, this is conclusory because he failed to explain *why* there was no difference between these types of power current.

But it is not true that Dr. Miller's entire testimony relevant to equivalent infringement was so slight. Dr. Miller's equivalent infringement theory very clearly relied upon his extensive foundational testimony about PWM, generally, and how that technology is employed by the ec-H2O modules' power source. Before his opinion about literal infringement, Dr. Miller gave a detailed explanation of PWM and how it is utilized by the power sources in Tennant's modules. This testimony was directly linked to his opinion that

---

[5] Tennant also argues that Dr. Miller's testimony functionally vitiates the claim limitation at issue here. ECF 895 at 21. But the Court finds that Dr. Miller's testimony on the doctrine of equivalents was generally consistent with his earlier expert opinion in this case. Because Tennant's legal argument about vitiation has never been raised at any time, despite many pre-trial opportunities, it has been waived.

the use of PWM in the ec-H2O modules effectively regulates power from a 36-volt battery such that the power source *literally* infringes a claim requiring a power source that "produces a voltage no greater than about 28.3 volts." So when Dr. Miller turned to his opinion about equivalent infringement, he specifically and unequivocally invoked his own earlier testimony about PWM to explain why Tennant's modules could alternatively be found to infringe under the doctrine of equivalents. *See* ECF 918 at 26 (numerous relevant citations to trial transcript). By doing so, he linked his earlier, particularized testimony about PWM to his argument that any difference between the voltage limitation in the claims and the voltage produced by the power source in the accused products was insubstantial. Not only is there no good reason Dr. Miller should have been forced to re-testify at length about PWM before opining on equivalent infringement, but the Court might have excluded such repetitive testimony in the interest of efficiency had OWT sought to elicit it. Indeed, this kind of efficient reuse of prior testimony has been expressly blessed by the Federal Circuit. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007) ("Our 'particularized testimony' standard does not require [an expert] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis. Indeed, *we think it desirable for a witness to incorporate earlier testimony in order to avoid duplication*.") (emphasis added).

And even if it were true that Dr. Miller's *entire* relevant testimony to the doctrine of equivalents was contained to two pages of trial transcript, it is not clear to the Court that this would be an issue. This was a fairly straight-forward patent trial that did not involve

particularly complicated accused technology or esoteric claim limitations. Rather, the direct infringement portion of this case mostly boiled down to an expert dispute over whether a power source with a 36-volt battery could infringe, literally or by equivalence, a claim requiring a power source that "produces a voltage no greater than about 28.3 volts." Dr. Miller's theory can be summarized succinctly: by using PWM to rapidly toggle a 36-volt battery's output, the power source in the accused modules actually produces a voltage of far less than 28.3 volts and therefore infringes the asserted claims. Unlike the cases cited by Tennant involving more complicated technology or infringement theories, there was no doubt that when Dr. Miller pivoted to testimony about the doctrine of equivalents, his opinion was informed by the exact same understanding about PWM in Tennant's modules: if the jury did not agree with his assessment that the PWM power source he described literally infringed the asserted claims, then that same PWM power source was so insubstantially different from the claimed invention that it infringed under the doctrine of equivalents. In sum, this Court concludes that Dr. Miller provided the jury with more than enough evidence to support its verdict under the doctrine of equivalents. Because the Court finds substantial evidence to support the jury's finding of infringement under the doctrine of equivalents using the insubstantial difference test, it need not consider whether JMOL is appropriate as to the function, way, result test.

### 2.    JMOL of No Willful Infringement Before 2019

One of the key issues for resolution at trial was whether or not Tennant's infringement was willful, and if so, when that willful infringement began. That issue is now before the Court again.

***Relevant Evidence***: The Asserted Patents are part of a family. The '092 patent is a continuation of the '665 patent, which is itself a continuation of the '415 patent. Each Asserted Patent lists the same inventor, James Senkiw. The Asserted Patents are each reissue patents of earlier patents. The '092 patent reissued in 2018, the '665 patent reissued in 2019, and the '415 patent reissued in 2015. Specifically, the '415 patent resissued from U.S. Patent No. 7,670,495 ("the '495 patent"). All three of the Asserted Patents share the same specification and claim priority to the same original patent applications filed in 2003. That application became U.S. Patent No. 6,689,262 ("the '262 patent"), which is the parent patent of all three Asserted Patents. The '262 patent issued to Aqua Innovations in 2004. Aqua Innovations assigned ownership of the patents to OWT in 2008, and OWT ultimately brought this lawsuit in 2020.

At trial the jury heard that, under Mr. Senkiw's leadership, Aqua Innovations made a commercial product called a Bait Keeper in the early 2000s. *See, e.g.*, Tr. 253:18–21; 161:8–10. The Bait Keeper produced micro- and nanobubbles through electrolysis for the purpose of oxygenating water to keep bait fish alive. *See, e.g., id*. 220:13–20; 224:4–227:5. The Bait Keeper was marked with the '262 patent. *Id*. 254:1–3; 183:18–20. A Tennant engineer named Bruce Field, who was at the time developing the company's own electrolysis technology for floor cleaners, discovered and purchased a Bait Keeper at a

Cabela's outdoor store because he found it immediately compelling. *Id*. 901:14–902:13. Mr. Field testified at trial: "I'd never seen anything like it before and started reading about it, and it said it was electrolyzing. So I thought that was pretty cool." *Id*. 901:18–21.

The jury heard that Mr. Field and his team bought as many as five Bait Keepers until they could no longer find any more at the store. *Id*. 919:23–24. Mr. Field wanted a sparger for use in a prototype electrolysis device for Tennant and he decided to use the sparger from the Bait Keeper. *Id*. 911:18– 912:18. Mr. Field testified that he tested the Bait Keeper in numerous ways, in a variety of water conditions, with a variety of voltages, and so forth, and that he cut open the device to see what was inside. *Id*. 912:19–914:25. He also testified that he reviewed the '262 patent because it was marked on the Bait Keeper and that he also searched for other patents associated with Mr. Senkiw because he was listed as the inventor. *Id*. 917:9–919:15. The jury then heard about Tennant's design process in 2006 and 2007 for its own electrolysis modules, including testimony about internal communications that stated a desire to "maintain equivalence to the Cabela's breadboard[6]" in Tennant's own sparger design. *Id*. 517:11–520:8. The jury was shown evidence that Tennant ultimately adopted a "flow-through" electrolysis sparging unit, and that the unit shared characteristics disclosed in Mr. Senkiw's patent applications. *See* PTX-574; Tr. 335:12–336:12, 925:21–927:14.

---

[6] The jury also heard testimony from a former Tennant employee involved in product design that the term "breadboard" meant an early prototype and that "Cabela's breadboard" referred to a prototype incorporating the sparger from the Bait Keeper purchased at Cabela's. Tr. 515:17–518:22.

Mr. Field discussed the Bait Keeper and the '262 patent in his own 2007 patent application disclosing a "cleaning apparatus having a functional generator for producing electrochemically activated cleaning liquid." *See* PTX-263 (U.S. Patent Publ. No. 2007/0186368); Tr. 147:12–21. And because of that reference in the patent application, the jury heard that OWT learned about Tennant's use of the Bait Keeper and made contact with Tennant. Specifically, OWT approached Tennant in 2010 about the possibility of licensing its patents, and in particular the '495 patent. *See, e.g.*, Tr. 145:23–148:22, 149:11–22. At the time, OWT was attempting a different commercial application for Mr. Senkiw's patents involving home-based electrolysis to remove iron from tap water. *Id*. 215:24–216:4; 130:1–136:7. The jury heard that OWT did not accuse Tennant of infringement or suggest it was considering litigation; according to OWT, this was due to budget woes and other concerns about provoking a much larger company like Tennant. *Id*. 150:16–151:14. Instead, OWT conveyed its belief that its patents were "broad and cover a wide variety of applications" and that this was meant to convey to Tennant that it needed to take a license. *Id*. 215:13–17. Tennant did not take a license. *Id*. 157:22–23.

Finally, the jury heard evidence about Tennant's patent tracking practices. Tennant set up alerts with a third-party tracking company for patent applications referencing "micro or nano bubbles." *Id*. 464:5–22; *See* PTX-389 (ECF 905-40); PTX-336 (ECF 905-38). There was evidence that this tracking was active from 2012 until 2019. PTX-389; PTX-336. Indeed, this search alert system flagged the '495 patent in 2012. *See* PTX-389 (ECF 905-40 at 3). The jury heard that the alert system ran reports "more than 5 and less than

25" times. Tr. 464:16–20. The jury also heard that Tennant was conducting its own research into existing technology related to the production of nanobubbles around the time that the '415 patent reissued in March 2015. Tr. 459:22-460:3. Despite these efforts to track the technology disclosed in the '415 patent, the jury heard testimony from two Tennant witnesses that Tennant was not aware of the '415 patent's existence. However, the jury also heard that Tennant failed to retain documents that showed the results of its patent searches. Tr. 457:1–467:21. Specifically, the jury heard that a Tennant employee shredded physical print outs of search results. *Id*. 461:1–25.

*Analysis*: As with infringement, "[a] jury's willfulness finding is a question of fact reviewed for substantial evidence." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017) (citing *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341–42 (Fed. Cir. 2016). "[T]he concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement." *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020). "A finding of 'subjective willfulness,' proof that the accused infringer acted in the face of a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer,' can satisfy this standard." *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 624 F. Supp. 3d 473, 480–81 (D. Del. 2022) (quoting *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016)).

Tennant's challenges the jury's findings on willfulness in two ways: first, that OWT failed to adduce any evidence at all tending to prove Tennant's knowledge of the '415

20

patent until 2019, and second, that OWT failed to adduce any evidence of deliberate or intentional infringement. Again, the Court disagrees.

Undeniably, this is not a prototypical willfulness case in which the jury heard undisputed evidence that the defendant knew about the patent being litigated. *See, e.g.*, *Willis Elec. Co. v. Polygroup Ltd.*, No. 15-CV-3443 (JNE/DTS), 2024 WL 3102257, at *14 (D. Minn. June 24, 2024) (denying JMOL of no willful infringement where the jury heard evidence that the defendant "knew about the [asserted] [p]atent, had concerns about infringement, but continued to sell the accused products anyway without developing or memorializing any good-faith non-infringement positions"). Instead, this is a case in which much of the conduct relevant to willfulness occurred before the '415 patent re-issued and where all of the undisputed knowledge was of the earlier patent. OWT leveraged the extent and overtness of that earlier conduct and knowledge for a powerful *inference* that Tennant knew or should have known both of the reissued '415 patent and of its infringement. In essence, the evidence of willfulness was circumstantial rather than direct.

There is nothing legally invalid about this approach. Afterall, "whether infringing conduct warrants a finding of willfulness [depends on] the totality of the circumstances of the case." *Minn. Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992) (citing *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978–79 (Fed. Cir. 1986)). And "although willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to support a finding of willfulness." *Id.* at 1581; *see also, e.g.*, *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 970–71 (Fed. Cir.

2018) (affirming the district court's denial of JMOL of no willfulness where the patentee "provided sufficient evidence for a reasonable jury to conclude that [the infringer] did know of [the] patents as they issued," in part because the infringer knew of related patents, was aware that the patentee's products were marked "patent pending," and had "a culture of copying") (emphasis removed); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 334–35 (S.D.N.Y. 2019) (denying JMOL of no willful infringement because "there was circumstantial evidence . . . for the jury to reasonably infer that [the infringer] had knowledge of the [asserted patent]," including that the infringer had knowledge of the parent patent disclosing the "same method and apparatus," and where the infringer's internal architecture documents bore "notable similarities" to embodiments disclosed in the asserted patent).

Here, the evidence, viewed through the totality of the circumstances, is similarly sufficient to support the jury's verdict on willfulness. The jury heard substantial evidence that Tennant's engineers intentionally used the patent-marked Bait Keeper sparger to develop its ec-H2O testing prototypes and additional evidence that the sparger in their commercial modules was specifically designed for "equivalence" to that sparger. Because the Bait Keeper was patent-marked, the jury heard that Tennant's engineers were intimately familiar with the '415 patent's parent and its inventor. That parent patent and all of the patents in the family of relevant OWT patents share an identical specification and disclose the same method and apparatus. The jury also heard undisputed evidence that Tennant was approached by OWT before the re-issuance of the '415 patent for patent licensing

discussions, and that OWT asserted its belief that the '495 patent covered a wide range of applications.

The jury also heard that, between 2015 and 2018, Tenant considered a redesign of its industrial scrubbers to remove the sparger, an infringing component, but decided that the removal process would be too expensive. And the jury learned that Tennant was a sophisticated company that held patents of its own and tracked the patents of others. The jury heard substantial evidence that Tennant set up patent-application alerts for patents disclosing the exact subject matter that is common to all of OWT's patents: micro- and nano-bubbles. The jury also heard that Tennant was researching the field of nanobubbles on its own, in anticipation of releasing new NanoClean electrolysis cleaning modules. After all this evidence, the jury heard testimony that Tennant had failed to retain documents showing search results and had actually shredded physical copies of those search results.

Given this evidentiary record, and granting the jury wide latitude to make credibility determinations about witness testimony,[7] the Court finds that the jury heard substantial evidence from which it could make two critical inferences: that Tennant knew of the existence of the '415 patent at the time it issued and that Tennant knew or should have

---

[7] Indeed, the Court observes that the employee who testified about the shredding gave some non-sequitur answers and could fairly be described as nervous under questioning about document retention. *See, e.g.*, Tr. 461:17–19 ("Q: And why did you shred [the search results]? A. New information becomes available or more comprehensive information becomes available."). It is certainly possible that this demeanor impacted the jury's assessment about the credibility of testimony about tracking patents but not finding the '415 patent. *See, e.g.*, *United States v. Hodge*, 594 F.3d 614, 618 (8th Cir. 2010) ("A jury's credibility determinations are well-nigh unreviewable because the jury is in the best position to assess the credibility of witnesses[.]").

known that it was then infringing the patent. Tennant's request for JMOL on willfulness is therefore denied.

### 3.    New Trial Based on No Willful Infringement

Tennant also seeks a new trial, on the basis that allowing the question of pre-2019 willfulness to go to the jury resulted in "passion or prejudice" that tainted the jurors' deliberations as to other issues. ECF 895 at 31. Having concluded that the jury's verdict on pre-2019 willfulness stands, the Court need not address whether a new trial is warranted[8] due to the jury hearing the evidence underlying that verdict. However, the Court will briefly note that, even if the Court granted JMOL on willfulness at this juncture, the Court would not grant the new trial that Tennant requests.

The problem for Tennant is that, even if this issue had been removed from the jury's consideration by the Court at Tennant's first request for JMOL, the jury would still have heard all of OWT's evidence on pre-2019 willfulness. Critically, Tennant did not seek summary judgment on pre-2019 willfulness, did not seek to exclude evidence relevant to the issue before trial, and did not seek exclusion or raise substantive objections to the introduction of the evidence during trial. So to whatever extent that the pre-2019 willfulness evidence made the jury more likely to find for OWT on other issues, which the Court by no means concludes was the case, it would have had the same impact even had

---

[8] In requesting a new trial based on jury taint, Tennant also suggests, without explicitly stating, that this Court should have bifurcated the issue of willfulness from infringement. ECF 895 at 31–32 (citing district courts bifurcating willful infringement). But Tennant never requested bifurcation, either before or during trial, and any arguments in favor of such an approach are therefore waived.

the Court granted JMOL when requested. The only difference had the Court done so before jury deliberations, is that the jury would have not heard closing argument from OWT's counsel regarding the "red flags" of willfulness. *See* ECF 895 at 33–34 (summarizing OWT's closing arguments related to willfulness).

Tennant suggests that OWT's closing arguments had a significant impact on the jury's ability to deliberate dispassionately. But having carefully reviewed the trial transcript, the Court simply cannot agree that the closing argument alone could have spurred the kind "passion or prejudice" that would necessitate an entirely new trial on all issues. The relevant portion of OWT's closing arguments was so explicitly linked to willfulness that Tennant can only speculate about what effect, if any, they could have had on collateral issues. But if the Court were to resort to speculation, it would go in a different direction. Indeed, it is easy to imagine that *if* the jurors were enflamed by anything at this trial that suffused their entire judgment, it was by certain themes that emerged from the evidence and Tennant's own defense strategy. After all, the jury heard essentially undisputed evidence that: a Tennant engineer was so smitten with an electrolysis device he found at Cabela's that he bought out the store's inventory and then reversed engineered that product and used it in proto-type development of Tennant's own electrolysis device for its floor cleaners; that other Tennant engineers discussed recreating aspects of that Cabela's device in developing Tennant's own electrolysis modules; that Tennant knew that the device was marked with one of Mr. Senkiw's patents and that its engineers had researched Mr. Senkiw and his patents; that a Tennant engineer named Mr. Senkiw's device and patent

25

in a patent application for Tennant that was related to electrolysis in floor scrubbers; and that despite this, when OWT came to negotiate a license, Tennant said no. Against this evidence, Tennant relied upon a rather overt defense that Mr. Senkiw's technology and patents were too unrelated and trivial for Tennant to know or care about. *See, e.g.*, Tr. 569:15–18 (testimony that Tennant did not monitor OWT patents because "they were in a completely different space" and "they were working on fish tanks and minnows"); *id.* 931:8–11 (testimony on same topic that OWT's patents "didn't have anything to do with cleaning, with our machines. [They] had to do with fish, had to do with minnows, had to do with growing plants, period. There was nothing in the spec that would allow it to do anything else.").

Simply put, the Court cannot conclude that this trial's outcome can be attributed to OWT's closing arguments on willful infringement. Rather, given the result of this trial, it appears that Tennant's broader story simply did not resonate with the jury. Accordingly, the Court would not grant a new trial even if it decided to grant JMOL of no pre-2019 willful infringement.

### 4. JMOL of No Induced Infringement and No Contributory Infringement of the '415 Patent

Tennant's arguments for no indirect infringement rise and fall with its request for no pre-2019 willful infringement. Indirect infringement, unlike direct infringement, requires knowledge of the infringed patent. *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015). The Court has already explained that sufficient evidence supports the jury's

willfulness finding, which requires that Tennant knew of the '415 patent since 2015. The motion for JMOL on induced and contributory infringement fail for the same reasons.

### 5.    JMOL Related to "Overseas" Units

Tennant raises two challenges to the number of infringing units (18,558) on which the jury based its verdict. First, Tennant seeks JMOL of "No Damages for Overseas Sales from 2015–2018." On the issue of overseas units, the dispute is over whether the jury heard evidence that would support a finding of infringement for units sold overseas between 2015–2018, due to the requirement in the Patent Act that infringement occur *within the United States*. *See* 35 U.S.C § 271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, *within the United States* . . . during the term of the patent therefor, infringes the patent.") (emphasis added).

"JMOL is appropriate only when there is 'no proof beyond speculation to support the verdict.'" *Speed RMG Partners*, 2023 WL 11960176, at *2 (quoting *Bavlsik*, 870 F.3d at 805). Here, there was sufficient proof to support the verdict. At trial, the jury heard evidence that Tennant manufacturers its ec-H2O modules in Michigan for distribution worldwide. *See, e.g.*, Tr. 624:1–625:1; 626:9–12; PTX-316. It heard evidence that Tennant tests a module in two ways: first, as a "subassembly" component before it is placed in a scrubber, *see* Tr. 608:11–609:1, 610:25–611:6, and second, when the module is placed into a floor scrubbing machine at the time of final assembly, *id*. 612:22–613:5. The jury heard and saw evidence that final assembly is conducted in three locations, one of which is in the Netherlands. *Id*. 625:2–25. The jury was then told by OWT during closing arguments that,

by testing the modules in Michigan, Tennant performed the method claimed in the '415 patent and therefore directly infringed the patent. *See id*. 1419:12–1420:5. Tennant did not object to the introduction of evidence that its modules were made and tested in Michigan, nor did it object to OWT's arguments at closing for how the jury could use that evidence in its deliberations on infringement and damages. The jury apparently agreed with OWT that scrubbers sold overseas, even those assembled there, contained modules that were first tested by Tennant in the United States and therefore included those units in its damages calculation. Tennant's post-trial arguments amount to an attack on the weight of evidence on this point. This is not a proper issue for JMOL.

> **6.    JMOL of No Damages for the 2,851 Additional Units Included in Dr. Nantell's 2015 Royalty Base**

Tennant also seeks JMOL of no damages for 2,851 specific units included in the 2015 royalty base as determined by Dr. Timothy Nantell, OWT's damages expert. This dispute centers around a somewhat confusing sales period in 2015, involving an inventory of Tennant's floor cleaners that were manufactured before the issuance of the '415 patent, but were sold after. During this time, Tennant was phasing the ec-H2O module out of its

28

smaller "commercial" floor scrubbers, and new units were transitioned to a non-infringing[9] module. There is some confusion in the record about how many 2015 commercial units contained an ec-H2O module and how many contained the newer non-infringing module. *See* ECF 948 (Post-Trial Mots. Hr'g Tr.) 60:8–61:4 (discussing that Tennant's records show sales of 5,680 units in 2015 without differentiating between the two types of internal electrolysis modules). The parties' damages experts essentially disagreed about whether and how to include pre-transition units from 2015 in their royalty bases. This amounted to a disagreement over 2,851 units.

The parties largely treat this as a simple issue of damages calculus, focusing on whether OWT's expert offered sufficient testimony to support his math. But as Tennant's briefing also makes clear, the threshold issue concerns whether there was substantial evidence that Tennant ever infringed the '415 patent with the pre-transition commercial units, not simply whether OWT's damages expert properly calculated the number of units in this category. Indeed, the patent claims at issue in this trial are method claims, and "[t]he law is clear that the sale or offer for sale is insufficient to prove direct infringement of a method claim." *Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 713 (E.D. Tex.

---

[9] The smaller, commercial floor scrubbers were transitioned to a new electrolysis module—the ec-H20 NanoClean (often referred to in this litigation simply as "NanoClean")—while Tennant's larger, industrial units continue to use the older ec-H20 modules that featured in this trial. Tennant utilizes two components for electrolysis: a tubular "sparger" and a rectangular "e-cell." The ec-H20 module contains both, and the NanoClean modules contain only the e-cell. Because this Court previously concluded that, as a matter of law, the e-cell component does not infringe certain claims because it lacks a "tubular housing," only questions of infringement related to the ec-H20 module were tried to the jury. Consequently, the trial mostly dealt with modules in industrial floor scrubbers.

2011) (citing *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993)), *aff'd,* 692 F.3d 1351 (Fed. Cir. 2012). This means that OWT had to prove that Tennant used the infringing technology in these units after their manufacture but before its sale.

The Court agrees with Tennant that the jury did not hear substantial evidence that would support its conclusion of direct infringement by the 2,851 disputed units. Unlike with the overseas units, OWT fails to point to specific evidence that Tennant infringed the '415 patent by its own use of the 2,851 pre-transition commercial units in question. OWT's theory appears to be that the units could have been tested during this timeframe, or may have been turned on as part of a demonstration on the sales floor, but this is far too speculative to support the jury's verdict as to these unique units.

The Court's ruling on this question, however, has no real impact on the verdict. The Court only finds that OWT failed to adduce substantial evidence of direct infringement for the 2,851 units identified by Tennant in its JMOL motion. But the Court has found that substantial evidence supported the jury's findings of induced and contributory infringement. Even though OWT failed to prove direct infringement for the 2,851 units, the evidence still supports the jury's likely decision to include those units in its damages total based on a theory of indirect infringement, which would have occurred whenever Tennant's customers operated their machines. Indeed, while the jury was asked to include the number of infringing modules that informed its damages total, it was not asked to differentiate in any way between modules that infringed directly versus indirectly. And the

Court will not make hindsight assumptions about which type of infringement applied to which of the 18,558 modules that the jury ultimately landed on.

### 7.    New Trial on Damages

Finally, Tennant seeks a new trial based on the assertion that Dr. Nantell failed to apportion the value of the infringing features in the ec-H2O module from the value of the non-infringing aspects of the ec-H2O module. ECF 895 at 41–44. Instead, Tennant contends that Dr. Nantell impermissibly relied upon the entire market value rule ("EMVR"), by seeking to capture the entire market value of Tennant's products that contain OWT's patented features. *Id*. Accordingly, Tennant argues that Dr. Nantell "presented the jury with a legally improper damages theory, rendering the jury's verdict legally improper." ECF 895 at 42. The Court disagrees and will not grant a new trial on this basis. Tennant's concerns about apportionment and the EMVR with regard to Dr. Nantell's opinion have been well documented in this case and are certainly preserved for appeal. But in previous rulings, the Court either already rejected admissibility arguments from Tennant regarding these concerns or provided the evidentiary guardrails that it saw fit. Nothing in Tennant's request for a new trial based on Dr. Nantell's damages testimony undermines those prior rulings and actions. And the Court certainly does not find that a new trial is "necessary to avoid a miscarriage of justice" arising from the jury's damages award. *Fair Isaac Corp.*, 711 F. Supp. 2d at 997.

Tennant's arguments for a new trial take aim at testimony that Dr. Nantell provided regarding his opinion about the "reasonable royalty" owed to OWT in this case. Damages

31

for patent infringement cannot be "less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. In the case of multi-component products, "royalties [must] be apportioned between the infringing and non-infringing features of the product." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018). The EMVR provides a narrow exception to this apportionment requirement, allowing a patentee to seek "damages based on the value of an entire apparatus containing several features, [only] when the feature patented constitutes the basis for consumer demand." *Id.* at 978 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009)); *see also Mirror Worlds*, 784 F. Supp. 2d at 724 ("The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product if the patented feature creates the basis for customer demand or substantially creates the value of the component parts.") (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)) (cleaned up). But if this narrow exception does not apply, courts are cautioned not to allow a damages theory that relies on the "entire market value" of the product. Tenant has repeatedly argued that OWT did just that in this case. The Court has previously disagreed, and continues to do so.

Drawing the line between the value of patented and non-patented components of an overall product "can be an exceedingly difficult and error-prone task." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). But the Court notes that in many cases finding a violation of the EMVR, that line is often crossed in obvious ways. For example, in *Mirror Worlds*, the court threw out a jury's nine-figure damages award in

part because the patentee had "presented a fatally flawed reasonable royalty analysis" that impermissibly relied upon the entire market value rule to calculate a $72 billion royalty base. 784 F. Supp. 2d at 726. The plaintiff was a patent holder who accused Apple of infringing several patents through three discrete features of the then-newest versions of Apple's popular "Mac OS X" operating system. *Id*. at 709. The plaintiff's infringement theories embraced not only the Mac OS X operating system, but also all of Apple's hardware that utilized the operating system, including a lengthy list of Apple computers (the "eMac, MacBook, MacBook Air, MacBook Pro, Mac mini, iMac, Mac Pro, iBook, PowerBook, Power Mac, and PowerPC"), mobile devices (the "the iPhone, iPod Touch, iPod Classic, iPod Nano, and iPad"), as well as other hardware such as servers. *Id*. The court noted that the plaintiff's royalty base was "undisputedly" based on "the entire market value of the accused commercial products," which is to say that the plaintiff's royalty base was based on the combined sales revenue of nearly every Apple software and apple product in existence at the time. *Id*. at 726. Such a calculation was only permissible under the EMVR if the three patented software features drove the *entire demand for* or constituted the *entire value of* Apple's operating system software and also of every one of Apple's hardware products capable of running that operating system. Given the yawning gap between the stature of the three software features identified by the plaintiff and the entire product line of the world's largest technology company, the *Mirror Worlds* court easily concluded that this was a burden plaintiff had failed to meet. *Id*. at 726–27.

33

Dr. Nantell's damages opinion is nothing like that of *Mirror Worlds*, nor of any of the apportionment and EMVR cases cited by Tennant. Dr. Nantell's opinion regarding the royalty necessary to compensate OWT for the use of its patented technology was not based on the entire market value of Tennant, nor on the entire market value of Tennant's floor scrubbing machines that contain an ec-H2O module, nor indeed even on the entire value of a single scrubber machine. His royalty base was not tied to the full value of Tennant's floor scrubbers at all.[10] Instead, even when read in the most unfavorable light as urged by Tennant, Dr. Nantell's opinion can be understood as setting a royalty base that is set against the value (in his estimate) of an ec-H2O module.

---

[10] In seeking a new trial, Tennant also advances another EMVR argument, pointing to several occasions in which OWT purportedly infected the trial by seeding information about the value of an entire floor scrubber machine, rather than simply the value of the module. ECF 895 at 50 (citing Tr. 81:10–12; 721:15–19). Tennant is correct that the Court did not allow OWT to set a royalty rate based on the purported value of Tennant's machines as a whole. *See id*. at 49 (citing trial transcript and the Court's rulings). And the Court also granted an unopposed motion *in limine* by Tennant seeking exclusion of evidence about Tennant's overall revenue "from its ec-H2O and NanoClean line of business." *See* ECF 850 at 8. In short, this matter was well-policed before and during trial. The Court disagrees with Tennant that the few identified instances of testimony that arguably pointed toward the overall value of floor scrubbers constituted a "repeated emphasis on [] large numbers." *Id*. at 50. Instead, these instances represented minimal, contextual information about Tennant's floor scrubbers, information the jury was likely entitled to hear as part of its task of imagining what royalty negotiations would have looked like in 2015. But even if the jury should not have heard these numbers *at all*, the Court still discerns no prejudice to Tennant that would warrant a new trial. Contrary to the assertion that these numbers "skewed the damages horizon for the jury," *id*., the jury very conspicuously landed on Dr. Nantell's exact per-unit royalty number, which undisputably was not based on the objected-to "big numbers."

Dr. Nantell's opinion conformed to the well-known *Georgia-Pacific* framework[11] for a hypothetical licensing negotiation between Tennant and OWT, in this case occurring in 2015 at the onset of Tennant's infringement. Tr. 733:2–734:13. Dr. Nantell testified about his understanding that the electrolysis technology performed by the ec-H2O module was an important driver of sales for Tennant. *See, e.g.*, *id*. 708:18–713:7; 741:22–742:9. He testified that he properly assumed the parties would have understood that the operation of the "sparger" component within the ec-H2O module infringed OWT's patents. *Id*. 717:6–10. He discussed that the basis for his understanding that the sparger was a key driver of the module's electrolysis functionality.[12] *Id*. 743:5–745:11. He testified about his

---

[11] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

[12] Tennant also seeks a new trial based on the argument that OWT advanced a "new damages theory" at trial. ECF 895 at 45–49. This request is denied. As discussed previously, there are two key components in the ec-H20 module: a sparger and an e-cell. The Court previously determined that the e-cell did not infringe. *See* ECF 692 at 21. This changed the landscape of the trial significantly. Tennant asserts that OWT previously maintained that both components produced nanobubbles but then abandoned that position and attempted to entirely attribute nanobubble production to the sparger unit during trial. Tennant raised this objection during trial, and the Court explained its contrary view that OWT was not actually shifting its view on the science of nanobubble production but was merely emphasizing the importance of the sparger, given the court's ruling about the e-cell. In a general sense, the Court does not believe that testimony and argument emphasizing the sparger's role was prejudicial, let alone a miscarriage of justice warranting a new trial. Tennant was free to push back on this narrative, whether through its own witnesses or through cross-examination. Furthermore, the Court disagrees with the specific suggestion that OWT brought an entirely "new damages theory" to trial or otherwise materially changed its position. As this Court observed at summary judgment, Dr. Nantell had already offered an alternative opinion in his expert report about a reasonable royalty in the event that only the sparger infringed. *See* ECF 692 (S.J. Order) at 26–27; *see also* ECF 664 (Nantell Rep.) at 54. The royalty figure for that scenario in Dr. Nantell's expert report was very similar to that offered at trial, and therefore Tennant had plenty of notice about what OWT would seek from the jury.

understanding that Tennant had tried, and failed, to remove the sparger from its ec-H2O modules and how this affected the royalty rate that Tennant would have agreed to pay OWT in the hypothetical negotiation. *Id*. 745:12–751:22. And perhaps most importantly, he testified about the basis for his understanding that Tennant had independently ascertained the profit it derived from the inclusion of an ec-H2O add-on module in the sale of one of its scrubbers. *Id*. 706:13-708:17; *see id*. 707:11–13 (testifying that Tennant's own analysis showed that in 2015, Tennant would have known it was "selling ec-H2O modules for $1,115 for [both] commercial and industrial scrubbers on average and that the profit [from the sale of each module] would be about $657"); *id*. 708:6–17 (explaining his calculation that the profit attributable to an ec-H2O module in an industrial floor cleaner, specifically, was $1,058).

Based on all of this information, Dr. Nantell ultimately told the jury that he believed a reasonable royalty was $529 per ec-H2O module. *Id*. 734:1–13. This figure was one half of the $1,058 in additional profit Dr. Nantell attributed to the inclusion of a module in an industrial floor cleaner. He testified that, in a hypothetical negotiation, the parties would probably start their conversation at about half of the $1,058 figure because of the relative value of the sparger and the non-infringing components in the module, with Tennant then attempting to go lower and OWT trying to push the royalty higher. *See e.g., id*. 717:11–718:17. He explained that after jostling back and forth in this manner, "it seems to me very sensible that they would end up [back] at $529 as a reasonable royalty." *Id*. 734:12–13. Tennant disagreed with this number and subjected Dr. Nantell to extensive cross

36

examination. Tennant also elicited testimony from its own damages expert, John Hansen, reaching a very different number of $56 per unit. *See, e.g.*, Tr. 1205:2–8. Among other things, Mr. Hansen testified that he reached this number based on his understanding that Tennant would have placed minimal value on the sparger because it would have believed it could be easily removed from its modules (*see, e.g.*, *id*. 1220:6–1222:16), the minimal cost of a sparger (*id*. 1227:20–22 (testifying that the sparger was a $6.53 component that Tennant sold for $38.50)), and the royalty rates found in OWT's previous licenses (*id*. 1229:12–15, 1230:2–23).

Simply put, the Court does not agree that Dr. Nantell failed to apportion. Rather, Dr. Nantell presented an apportioned royalty that credited the infringing features in the ec-H2O more generously than other features. Tennant disagreed with this assessment. And Mr. Hansen presented a fundamentally different apportionment analyses, which gave little value at all to OWT's patented features. But through experts, "[e]ach party is free to present and highlight the [evidence] most favorable to its case and allow the opposing party to attempt to bring out any weaknesses in the [evidence] through its cross-examinations and case-in-chief." *CNH Am. LLC v. Kinze Mfg., Inc.*, 809 F. Supp. 2d 280, 286 (D. Del. 2011). Ultimately, it was up to the jury to resolve these differences, and the jury agreed with Dr. Nantell over Mr. Hansen. This is the proper resolution of a classic "battle of the experts." *See, e.g.*, *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 985 (Fed. Cir. 2021) (affirming district court's denial of defendant's motion for JMOL or a new trial on damages where defendant cross-examined opposing expert's opinions regarding reasonable royalty

rate and presented testimony of its own damages expert suggesting a much lower royalty rate).

The Court also disagrees that Dr. Nantell's opinion ran afoul of the EMVR. Tennant has cited no persuasive authority for its proposition that a patentee who calculates a royalty base on the value of a *component* within a larger product must show that its patented features create the basis for demand or value of that component. Such a requirement is unwieldy and is not present in the case law, which typically deals with the much more obviously problematic scenario in which a patentee tries to set a royalty base for the infringement of a *sub*-component on the value of an entire product (or, as in *Mirror Worlds*, lines of products) in which that sub-component exists. Furthermore, even if such authority existed, neither Dr. Nantell nor the jury adopted a royalty that claimed the full value of the component that contained the infringing sparger. There was sufficient evidence from which the jury was permitted to agree with Dr. Nantell's royalty rate, crediting the sparger with half of his calculation of the value of the ec-H2O module as a whole.

## II.    OWT's Motion for Enhanced Damages, Fees, Interest, and Costs

After trial, OWT moved for enhanced damages, attorney fees, costs, and prejudgment and post-judgment interest. The requests for enhanced damages, fees, and prejudgment interest are each pursuant to the Patent Act and therefore subject to Federal Circuit law, as examined below. For the reasons that follow, the Court enhances the jury's damages award by 30% and assess prejudgment interest from 2015 at the prime rate, both pursuant to 35 U.S.C. § 284. However, the Court denies OWT's request for fees, pursuant

to 35 U.S.C. § 285. And the Court will award costs and post-judgment interest in a forthcoming entry of judgment that is consistent with these decisions.

### A. Enhanced Damages

When a jury finds damages resulting from patent infringement, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. This is an "exercise of discretion," in which courts should "take into account the particular circumstances of each case." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016). Enhanced damages should "generally be reserved for egregious cases typified by willful misconduct." *Id.* "The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 103–04. OWT has the burden of proving its entitlement to enhanced damages by a preponderance of the evidence. *Id.* at 107.

To determine whether enhanced damages are warranted under the totality of the circumstances, courts frequently look to nine factors laid out by the Federal Circuit in *Read Corp. v. Portee, Inc.*, 970 F.2d 816 (Fed. Cir. 1992). "These factors provide useful guideposts in the court's exercise of discretion but are not binding or exhaustive." *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 112 (E.D. Tex. 2017) (internal quotations omitted). Here, the parties have briefed their respective positions using the *Read* factors, which the Court will consider in turn.

### *Read* Factor 1: Whether the infringers deliberately
### copied the ideas or design of another

Nearly all of the facts relevant to both sides' positions on "copying" are laid out above, in the Court's discussion of the jury's willful infringement verdict and Tennant's request for JMOL on that issue. Suffice to say, Tennant cannot avoid the fact that its own engineers acquired a patent-marked Bait Keeper, used it in prototype development of the ec-H2O module, and developed commercial modules seeking "equivalence" to that same Bait Keeper. Nor can it get around the fact that the sparger in the modules today still bears quite obvious similarities to an embodiment disclosed in Mr. Senkiw's earliest patent application. Tennant attempts to downplay the significance of these facts by suggesting that the Bait Keeper was not actually very effective in the prototypes and by suggesting that seeking "equivalence" to the Bait Keeper was not really copying but merely a sort of legitimate exercise of iterative invention. *See* ECF 915 (Opp. to Mot. for Damages and Fees) at 28–29. The Court is not very persuaded by either of these arguments. If the Bait Keeper was not an effective solution for prototype development then the later design would not have sought "equivalence" to it. And while "equivalence" could indeed mean something different than copying in many contexts, an actual Bait Keeper was used in the module prototype, thus belying more innocent or nuanced explanations.

Tennant also argues that the evidence related to its use of the Bait Keeper is not relevant to the copying inquiry because that evidence arises from events that occurred before the issuance of the patents in suit. *Id*. at 29–30. But the first *Read* factor considers more than the rote copying of claims of a patent asserted in litigation by deliberately asking

40

about the copying of the "ideas and design of another." *See* 970 F.2d at 827 n.7 ("'Ideas' and 'design' would encompass, for example, copying the commercial embodiment, not merely the elements of a patent claim"). And courts have therefore repeatedly held that copying can occur before a patent issues. *See, e.g.*, *Barry*, 250 F. Supp. 3d at 112 ("The copying inquiry under *Read* focuses not on whether [defendant] copied [plainitff's] patent but whether it copied 'the ideas or design of another,' regardless of when [plaintiff's] patents might have issued."); *Canon, Inc. v. Color Imaging, Inc.*, 292 F. Supp. 3d 1357, 1362 (N.D. Ga. 2018) ("The first *Read* factor does not focus on whether Defendants copied the [asserted] patent itself, but whether they copied the 'ideas or design' of Plaintiff's [invention]—which could have occurred before the [asserted] patent issued."). All told, there is considerable evidence that Tennant utilized both a commercial embodiment of Mr. Senkiw's invention and his patent disclosures in developing the sparger component of its modules.

However, some facts still mitigate the salience of copying in this case. For one, Tennant was developing an entire electrolysis module for use in its floor-scrubbers, not just a sparger. In fact, the jury heard that the developer of the ec-H2O module was inspired to use alkaline water as a way to clean floors during a trip to Japan, and had settled on the idea to use electrolysis to produce such water before the discovery of the Bait Keeper in Cabela's. Indeed, the sparger comprises just one component of a larger system, and there is no evidence from which the Court could reasonably conclude that Tennant would not have achieved an effective electrolysis module for the purposes of floor cleaning if not for

its use of the Bait Keeper. Indeed, Tennant's use of the Bait Keeper can probably be best understood as driven by convenience, with attendant casual disregard for Mr. Senkiw's intellectual property, rather than a pirate's intent to steal Mr. Senkiw's invention and thereby unlock the door to better floor cleaning.

Moreover, to whatever extent OWT believed that some amount of copying of the Bait Keeper had occurred in the ec-H2O module design, it is not clear that OWT could show that the copying amounted to infringement—at least until the '415 patent was reissued with its broader claims that were specifically tailored to challenge Tennant's products. *See* ECF 915 at 30. Tennant is also correct that many enhanced-damages cases involve copying with the intention of undermining a direct competitor. Such misbehavior is not present in this case, which deals with allegations that a multinational floor-scrubber manufacturer copied a hobbyist inventor's product for fishing enthusiasts. These observations do not erase the objective reality of Tennant's infringement, but they do mitigate the strong salience of copying as a reason to enhance the damages. *See, e.g.*, *Purewick Corp. v. Sage Prods., LLC*, 666 F. Supp. 3d 419, 447 (D. Del. 2023) (finding the first factor neutral where there was no evidence of "egregious copying" by the defendant).

Consequently, the Court finds that, given the coexistence of the evidence of copying with these mitigating factors, the first *Read* factor favors enhancement, but only modestly.

### *Read* Factor 2: Tennant's investigation of the scope of the patents and any good-faith belief that they were invalid or that they were not infringed

Addressing this factor, the parties largely focus on the significance of certain pre-suit conduct by Tennant and its employees after OWT's unsuccessful 2010 licensing

outreach. But this evidence, which speaks to Tennant's longstanding familiarity with Mr. Senkiw's earlier patents, is mostly relevant to the jury's inference that Tennant had knowledge of the '415 patent once it reissued. Its salience to Tennant's good-faith beliefs about the Asserted Patents in this litigation is far less clear. Indeed, as for Tennant's beliefs about *those* patents, the Court has little to go on. After all, Tennant maintained throughout trial that it never knew about the patents' reissuance until the early rounds of communication that culminated in this lawsuit, and invalidity was not an issue at trial. It is unsurprising, then, that Tennant did not produce evidence that showed any investigation of any of the Asserted Patents that would reveal any conclusions about non-infringement or invalidity. *Cf Barry*, 250 F. Supp. 3d at 115 (addressing defendant that denied pre-suit knowledge of patent at trial and observing that "presumably in an effort to comport with this theory, [defendant] did not present any testimony or documents indicating that it investigated the scope of the patents or made efforts to ensure [non-infringement]").

However, the jury ultimately concluded that Tennant did know about the '415 patent by finding willful infringement beginning in 2015. Viewing the facts of this case in that light, it is well-established that "[t]he absence of evidence of an adequate investigation" into non-infringement and invalidity is itself a factor that "weighs in favor of enhanced damages." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 258 F. Supp. 3d 1013, 1032 (N.D. Cal. 2017) (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 09-cv-5235-MMC, 2017 WL 130236, at *4 (N.D. Cal. Jan. 13, 2017)); *Barry*, 250 F. Supp. 3d at 115 (defendant's exclusive reliance on defense theory that it lacked pre-suit knowledge

"implicitly concedes that it could not have investigated the patents and could not have formed a good-faith belief that the patents were invalid in response to the alert").

Morever, there is little reason to conclude that Tennant could have believed that it did not infringe or that the patents were invalid. Indeed, for some of the claims asserted at trial, Tennant had long-ago stipulated to infringement and simply sought to litigate damages. Tennant attempts to mask this reality by pointing to its views about non-infringement by the e-cell module component, which the Court removed from this case on summary judgment. *See* ECF 915 at 34. It is true that this was a significant moment in this case, and it is very likely that Tennant adopted a lot of its broader litigation posture based on the good-faith belief that the e-cell did not infringe. But the Court's ruling on the e-cell does not bear on good-faith belief about the other infringement questions: that of the sparger and the power source. The question here concerns the good-faith belief of non-infringement by those modules. And Tennant can point to little that would support such a belief.[13]

Tennant also falls short of proffering a good-faith belief of invalidity. Indeed, this Court affirmatively granted summary judgment of no invalidity on two bases, *see* ECF 693 (Order on Pl's Mot. for S.J.) at 39 (finding claims of the '415 patent and '092 patent not

---

[13] Tennant reiterates its belief that the jury would agree with the "common sense argument" that a module with a 36-volt battery cannot infringe a patent requiring a power source of no greater than 28.3 volts as a basis for its good-faith belief of non-infringement. ECF 915 at 35. The Court agrees that this was a reasonable belief to hold about literal infringement. But Tennant's contention elides the obvious possibility that such a module would nevertheless infringe under a straight-forward application of the doctrine of equivalents.

invalid for lack of written description and claims of the '092 patent and '665 patent not invalid for obviousness), while the Patent Trial and Appeal Board has now twice rejected separate arguments that claims of the '415 patent are invalid as anticipated or obvious, *see generally Tennant Co. v. Oxygenator Water Techs., Inc.*, No. IPR2021-00625, 2025 WL 659161 (P.T.A.B. Feb. 28, 2025). Moreover, the Court observes that while it refrained from granting affirmative summary judgment of no invalidity for indefiniteness as to claims 13, 18, 24, and 26 of the '415 patent and claim 26 of the '092 patent, *see* ECF 693 at 24 (concluding that two disputes of material fact precluded summary judgment of no indefiniteness), Tennant ultimately chose not to argue indefiniteness to the jury, where it would have borne the burden of proof.

Overall, *Read* Factor 2 supports enhancement.

### *Read* Factor 3: Tennant's behavior as parties to the litigation

"The third *Read* factor examines whether the infringer engaged in litigation misconduct, which refers to 'bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation.'" *Canon,* 292 F. Supp. 3d at 1365 (quoting *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010)). OWT argues that this factor supports enhanced damages in this case, but the Court disagrees. At worst, this case perhaps should have resolved earlier. But there is nothing concrete in the record to suggest that it was Tennant alone that blocked a speedier resolution. In one example, OWT points to improper shifting-sands litigation tactics after Tennant hired new counsel in this case and purportedly attempted to advance new

45

arguments and defenses. *See* ECF 904 (Mem. in Supp. of Damages and Fees) at 28. But even if this occurred, being "required to seek a pre-motion conference with the Magistrate Judge before Tennant finally agreed to withdraw many of the new defenses," ECF 933 (Rep. Br. in Supp. of Damages and Fees), is more of a routine skirmish in the trench warfare of patent litigation than evidence of litigation misconduct. Looking further back, it was OWT that advanced an initial infringement theory about the e-cell that the Court found implausible. And since summary judgment, neither party appeared overly committed to settling to avoid trial. As for OWT's contentions about certain conduct by Tennant at trial— for example, its failed efforts to bring in a "test stand" to demonstrate the module's operation to the jury—the Court disagrees that anything about its evidentiary rulings at trial should be construed as pointing toward misconduct by Tennant. To the contrary, it is the Court's view that both sides tried this case professionally and within the boundaries of zealous representation. Nothing Tennant did was vexatious or abusive.

This factor does not support enhancement.

### *Read* Factor 4: Defendants' size and financial condition

"This factor focuses on the overall financial health of the infringer to ensure that enhanced damages would not prejudice defendant's non-infringing business." *Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285, 1298 (S.D. Fla. 2010), *aff'd,* 663 F.3d 1221 (Fed. Cir. 2011); *see also Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 902 (E.D. Wis. 2017) ("The fourth factor is used to ensure that any damages enhancement is not out of proportion with the defendant's size and the scope of its

46

infringing versus non-infringing sales."). Here, there is no dispute that Tennant is a large and successful publicly held company. Tennant disputes the significance of this factor, but declines to raise any concerns about its financial condition in context of opposing enhanced damages.

This essentially uncontested factor supports enhancement.

### *Read* Factor 5: Closeness of the case

"The fifth factor examines whether the case involved a meaningful defense to the claims or whether it was easily decided against the infringer. It ties in closely with the second factor, which looked to whether the infringer had some good-faith basis on which to defend itself." *Milwaukee Elec. Tool*, 288 F. Supp. 3d at 903 (citing *Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*, 198 F. Supp. 3d 1343, 1352 (S.D. Fla. 2016), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017)). Part of Tennant's position that this was a close case once again leans on the Court's decision to remove the e-cell, and a large portion of the possible damages, from the case at summary judgment. Similarly, OWT also seeks to leverage the Court's findings of no invalidity as demonstrating the strength of its own case. But here the Court will focus instead on the closeness of the case that was actually tried to the jury, resulting in the award that OWT now seeks to enhance.

As observed above, Tennant entered trial having stipulated to infringement of many of OWT's asserted claims and only sought to try the question of damages. While this question of infringement was not "close," the dollar value of that infringement was hotly

contested.[14] This leaves the claims of the '415 patent requiring a power source of no greater than 28.3 volts. Here, the Court agrees that the relatively swift clean-sweep jury verdict is indicative of the strength of OWT's case, but disagrees with any conclusory reliance on the verdict to show that the case was not at all close. Broken out by issue, the Court believes that the jury could have gone either way as to literal infringement, both direct and indirect, and as to the very willfulness finding that is the predicate to OWT's request for enhanced damages. But as for doctrine of equivalents infringement of the '415 patent and some of the ancillary issues like the overseas units, the Court does not view the case as particularly close and concludes that OWT clearly had the stronger position. And the Court again observes that Tennant did not attempt to argue its remaining invalidity position to the jury.

Given this mixed picture, the Court concludes that this factor modestly supports enhancement.

### *Read* Factor 6: Duration of Tennant's misconduct

OWT argues that that this factor favors enhanced damages because the infringement in this case essentially spans the entire life of the Asserted Patents and only stopped upon each patent's expiration. But the Court concludes that duration of infringement is not a relevant factor for enhancement here. To begin with, the line that separates a normal versus an extended duration of willful infringement is not very clear in the case law. *Compare*

---

[14] With that being observed, the Court also notes its reluctance to lean too heavily on a party's stipulation to infringement as a controlling basis to later punish that party with a discretionary damages enhancement. Doing so risks undermining the civil and efficient resolution of disputes by future parties in patent cases. Consequently, the Court refrains from placing great weight on the stipulation under this *Read* factor.

*Canon,* 292 F. Supp. 3d at 1367 (five-year duration is significant and favors enhancement), *with Barry*, 250 F. Supp. 3d at 118 (three-plus-year duration does not suggest "egregiousness" that supports enhancement). And it is further unclear that the amount of time that Tennant was infringing (particularly the time pre-suit) is a significant aggravating aspect of this case. OWT did not engage in any patent enforcement efforts over the pre-suit infringement period. Indeed, it did not communicate at all with Tennant after the '415 re-issued until a string of pre-suit communications in 2019.  More critically, OWT is not a market competitor with Tennant, and this is not a case of lost profits to OWT that grew over the duration of infringement. Instead, this is a royalty case, and the accumulated damages over the years in which Tennant should have taken a license are concretely captured by the jury's verdict.

　　This factor does not favor enhancement.

### *Read* **Factor 7**: **Remedial action by Tennant**

　　This factor considers mitigating aspects, "such as 'whether the defendant ceased the sale of the infringing product during the pendency of the litigation,' or whether the defendant 'shows an effort to design around the patent.'" *Canon*, 292 F. Supp. 3d at 1367 (quoting *Creative Internet Advert. Corp. v. Yahoo! Inc.*, 689 F. Supp. 2d 858, 869 (E.D. Tex. 2010) and *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 258 F. Supp. 3d 1013, 1035 (N.D. Cal. 2017)) (cleaned up). Here, there is no dispute that Tennant failed to cease its infringement over the course of this litigation. In fact, the only reason that Tennant is not

still infringing today is that the Asserted Patents expired in 2023. But the question of whether Tennant attempted a design-around is more complicated.

First, this inquiry is awkward because Tennant never admitted to knowing about the '415 patent and therefore could obviously offer no evidence that it knowingly attempted to design around the patent before the initiation of this lawsuit. However, it was undisputed that Tennant did know about OWT's earlier patents, which also disclosed a similar sparging device. And there is no dispute that Tennant removed the sparger from a great number of its electrolysis modules in the years following OWT's failed licensing outreach. Indeed, the NanoClean modules that Tennant uses in its dominant "commercial" floor scrubbers do not contain a sparger and only rely upon an e-cell to generate electrolysis. Although OWT also believed that the e-cells infringe, the Court disagreed and effectively removed them from the case. So it must be acknowledged that for a great number of its electrolysis modules, Tennant succeeded in designing around OWT's patents.

But the facts weighing against Tennant are numerous. The sparger remains in the modules used in Tennant's larger industrial units, and this fact highlights a central tension in Tennant's defense. At trial Tennant introduced evidence aimed at minimizing the role the sparger played in the electrolysis generated in the ec-H2O modules. Furthermore, Tennant asked the jury to assess very little value to any infringement by the sparger, in part because of how little each sparger costs. But Tennant could not get around a simple reality: if the sparger is of such marginal significance, then why does it remain in the ec-H2O module to this day? Indeed, as OWT correctly observes, "if Tennant is to be believed, it

50

had ample opportunity to stop infringing and simply chose not to do so." ECF 904 at 32. It is very likely that this tension cut against Tennant's credibility before the jury, and it undermines Tennant's position on this enhancement factor, too.

Overall, this is another mixed picture. This factor somewhat supports enhancement.

### *Read* Factor 8: Tennant's motivation for harm

"Here, the Court must discern whether [Tennant's] infringement was done with a 'pernicious' intent to harm [OWT]." *Milwaukee Elec. Tool*, 288 F. Supp. 3d at 904 (quoting *Read*, 970 F.2d at 827). "[T]his factor is typically viewed as supporting enhanced damages where 'the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market." *Trs. of Columbia Univ. City of New York v. Gen Digital Inc.*, No. 3:13cv808, 2023 WL 8699435, at *16 (E.D. Va. Sept. 30, 2023) (quoting *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, No. 8:14cv01352, 2021 WL 3116849, at *14 (C.D. Cal. Feb. 16, 2021)). In this case, factor eight is of minimal significance because the parties are not competitors. *See Powell*, 715 F. Supp. 2d at 1299 (citing *Krippelz v. Ford Motor Co.*, 670 F. Supp. 2d 815, 824 (N.D. Ill. 2009)).

OWT nevertheless argues that this factor supports enhancement, suggesting that Tennant should bear what is essentially a trial penalty for exploiting OWT's small size and making it "litigate this case through trial." ECF 904 at 25. The Court has already made observations about the manner in which this case was litigated, and disagrees with OWT's characterizations. Suffice to say, the Court does not find that Tennant's decision to force OWT to try its case before a jury reveals a pernicious intent to harm OWT that goes beyond

51

the typical motivations underlying litigation. Ultimately, any motivation to infringe and then to make OWT bring its claims to trial, is better explained by Tennant's own economic self-interest, a motivation that does not typically support enhancement. *See Powell*, 715 F. Supp. at 1299; *Barry*, 250 F. Supp. at 117.

This factor does not support enhancement.

### *Read* Factor 9: Whether Tennant attempted to conceal its misconduct

OWT briefly argues that this final factor is neutral. OWT suggests that while Tennant sells its ec-H2O modules commercially, and it is therefore "impossible" to hide any infringement by those modules, it "never informed" OWT about the use of the Bait Keeper in its early modules. ECF 904 at 34. When, how, or why Tennant should have done so is unclear. In contrast, Tennant is correct to note that Bruce Field also cited the Bait Keeper and Mr. Senkiw's patent in his own patent application, which reveals a degree of affirmative transparency.

The Court agrees that this case is not one that involves evidence of subterfuge on Tennant's part. The factor does not support enhanced damages.

### Conclusion

Having considered the totality of the circumstances, the Court concludes that enhanced damages are appropriate in this case. However, the Court will not treble the jury's award or even approach that number. To widely varying degrees, five *Read* factors favor enhancement and four factors do not. "When some of the *Read* factors are neutral or weigh against enhancement, courts routinely enhance damages below the statutory maximum."

*Wirtgen Am., Inc. v. Caterpillar, Inc.*, No. 1:17-cv-00770-JDW, 2024 WL 4216057, at *20 (D. Del. Sept. 17, 2024) (citing *Barry*, 250 F. Supp. 3d at 119).

Beyond its weighing of the *Read* factors, the Court is also cognizant of the dollar figure reached by the jury in this case. Simply put, the jury was asked to select between two numbers—one high and one low. It selected OWT's to a penny. And while the Court has rejected Tennant's arguments arising from Dr. Nantell's opinion in the context of the EMVR and apportionment, the Court is not naïve to the reality that his royalty figure sits at the high end of what can be credibly proposed given the facts and data underpinning this case. Had the jury settled on a royalty closer to that proposed by Tennant's expert, this Court might view enhancement differently. But here, Dr. Nantell's royalty figure very generously values both OWT's intellectual property and the price to be paid for its infringement.

The Court will therefore increase the jury award by 30%. This number adequately captures the serious aspects of the infringement in this case and the fact that a majority of the *Read* factors favor enhancement, without overlooking the mitigating factors discussed herein. And this assessment finds support in a host of cases that apply similar enhancements in cases with analogous facts. *See, e.g.*, *Barry*, 250 F. Supp. 3d at 111 (enhancement of 20% of the total final damages award); *Powell*, 715 F. Supp. 2d at 1299 (enhancing a $15 million jury award by $3 million where seven of nine *Read* factors weighed in favor of enhancement); *Canon,* 292 F. Supp. 3d at 1369 (enhancement of 20% where the case did "not rise to the level of egregiousness that warrants treble damages, but instead presents a

lesser degree of egregiousness consistent with precedent"); *Apple*, 258 F. Supp. 3d at 1036 (30% enhancement where three factors favored enhancement, one slightly favored, one was neutral, two weighed slightly against, and two weighed against); *Wirtgen*, 2024 WL 4216057, at *20 (adopting a 50% enhancement to "reflect[] the seriousness of [defendant's] continued infringement of [plaintiff's] patents while avoiding an excessive enhancement"); *see also WBIP, LLC v. Kohler, Co.*, 829 F.3d 1317, 1342 (Fed. Cir. 2016) (affirming a 50% enhancement based on analysis of mixed *Read* factors); *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 867 (Fed. Cir. 1997) (affirming 10% enhancement under mixed *Read* factors); *cf Arctic Cat Inc.*, 198 F. Supp. at 1350–54 (awarding maximum treble enhancement where seven of nine *Read* factors "compellingly" and "overwhelmingly" pointed to that outcome); *AAT Bioquest, Inc. v. Texas Fluorescence Lab'ys, Inc.*, No. 14-CV-03909-DMR, 2015 WL 7708332 at *13–14 (N.D. Cal. Nov. 30, 2015) (defendant's "deliberate copying," "doggedly blind confidence" on non-infringement and invalidity, and motivation to harm the plaintiff were among eight of nine *Read* factors supporting maximum enhancement); *Milwaukee Elec. Tool*, 288 F. Supp. 3d at 900–904 (no enhancement at all where only two *Read* factors supported enhancement); *Power Integrations,* 2017 WL 130236, at *4–5 (same).

## B.    Attorney Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An exceptional case has no set definition and is "simply one that stands out from others with respect to the substantive strength of a party's litigating position

(considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). "In assessing the totality of the circumstances, courts consider 'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-cv-820 (JRT/HB), 2018 WL 1041038, at *1 (D. Minn. Feb. 23, 2018) (quoting *Octane Fitness*, 572 U.S. at 554 n.6).

Much of OWT's arguments in favor of fees collapses the distinction between the verdict being entirely in OWT's favor, enhanced damages for willful infringement, and exceptional case fees. *See* ECF 904 at 37 ("First, and perhaps most importantly, the jury found that Tennant's infringement was willful and had been since 2015. A finding of willfulness alone is sufficient to justify an award of attorneys' fees."); *id.* ("Beyond the jury's findings, the totality of the circumstances described above and discussed in the context of the *Read* factors indicates that this case is exceptional."). But these assertions elide important distinctions in the fee analysis, generally, and overlook relevant context from this case, specifically.

Many courts have discussed the interplay between enhanced damages and attorney fees under the Patent Act, particularly in light of two somewhat recent Supreme Court decisions, both cited herein: 2014's *Octane Fitness*, regarding exceptional case fees, and 2016's *Halo*, regarding enhanced damages. As the court in *Barry v. Medtronic* observed,

though interrelated, the "inquiries are different, since attorney's fees are intended to compensate a prevailing party, while enhanced damages punish an infringer." 250 F. Supp. 3d at 121. "*Halo*'s focus on culpability 'at the time of the challenged conduct' for enhanced damages reiterates that enhanced damages are punitive damages awarded to penalize willful *infringement* versus general litigation misconduct." *Id.* (quoting *Halo*, 579 U.S. at 105). "One way of unpacking the interplay . . . could be to focus analysis of enhanced damages primarily on defendant's conduct related to the infringement, while consideration of attorney's fees could focus more on those fees and costs necessarily imposed on the winner by the questionable litigation tactics of the losing party." *Id.* at 120–21 (citing *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986) and *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)).

Viewed through this lens, the Court cannot find that this case is exceptional under § 285. Indeed, certain aspects of this case perfectly illustrate how the fees analysis can depart from that of enhancement. For example, Tennant's stipulation to infringement of certain claims by certain modules hurts Tennant under the second and fifth *Read* factor, as discussed above. But that same stipulation, which the Court observes was entered long before this case was trial-ready, weighs against awarding fees. Simply put, Tennant's acquiescence on this point was not required, and it does not indicate a party refusing to litigate reasonably. And while OWT emphasizes "Tennant's exceptionally aggressive litigation tactics" by positing that "many patent owners would have given up," ECF 904 at 37–38, there is no support for the idea that simply not settling merits a fee award. The Court

disagrees that OWT has pointed to anything that amounts to the kind of frivolous or bad-faith litigation behavior that would require an award of fees.

The Court also observes that if the final case that was tried to the jury looks like a total vindication of OWT's persistence in this lawsuit, it is only because of the winnowing decisions of this Court. This case began *far* more broadly, and was narrowed through at least two significant limitations imposed on OWT's theories: first, at claim construction (*see Markman* Order at 36 (adopting Tennant's arguments on the construction of "tubular housing" as requiring a "circular cross-section," and thereby effectively eliminating literal infringement by Tennant's e-cell), and again at summary judgment (*see* ECF 692 at 21 (concluding that the e-cell could not infringe claims requiring a "tubular housing" under the doctrine of equivalents). Undeniably, these decisions by the Court upended the economics of this case for OWT. But OWT cannot seek to be compensated for fees it amassed in the partially unsuccessful pursuit of a much larger lawsuit.

At the end of the day, this litigation was a hard-fought and drawn-out affair. It resulted in a significant win for OWT at trial. But these facts, without more, do not require a fee award. *See, e.g.*, *Barry*, 250 F. Supp. 3d at 122 (case was not exceptional, where "[t]he parties went head-to-head and the determination ultimately turned on the jury's assessment of the evidence and the credibility of witnesses"); *Schwendimann*, 2018 WL 1041038 at *2 ("While the jury ultimately found that [defendant's] claims and defenses were meritless, the Court does not find that they were so exceptionally meritless as to warrant an award of attorney fees in this case."). Moreover, OWT's victory came after Tennant prevailed on

CASE 0:20-cv-00358-KMM-DTS    Doc. 951    Filed 09/03/25    Page 58 of 63

critical substantive positions at earlier stages of the litigation. And even at trial, Tennant did not lack credible defense theories on the key issues of damages and on willfulness. *See Schwendimann*, 2018 WL 1041038 at *2 (observing that the "case was a closer call on the issue of willful infringement than in many other cases" and thus "willful infringement alone does not support a finding of exceptionality"). Therefore, under the totality of the circumstances, the Court cannot conclude that this was an exceptional case worthy of a fee award.

### C.    Prejudgment Interest

"[P]rejudgment interest should ordinarily be awarded under [35 U.S.C.] § 284." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *see id.* ("[A]n award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement."). "Prejudgment interest 'runs from the earliest date of infringement for any patent issued,' and 'should be awarded under § 284 absent some justification for withholding such an award.'" *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-02637 (SRN/BRT), 2019 WL 405513, at *28 (D. Minn. Jan. 18, 2019) (quoting *Comcast IP Holdings I LLC v. Spring Commc'ns Co., LP*, 850 F.3d 1302, 1313-14 (Fed. Cir. 2017).

OWT seeks prejudgment interest dating to March 17, 2015. ECF 904 at 40. Tennant counters that interest should begin only in 2019, when OWT formally accused it of infringing the Asserted Patents. ECF 915 at 54. According to Tennant, OWT's failure to enforce its patent rights until 2019 represents the kind of "undue delay" that can toll the

58

accumulation of prejudgment interest. It is true that "a district court has some discretion to decide whether to award prejudgment interest, and 'it may be appropriate to limit prejudgment interest, or perhaps even to deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit,' among other potential, unnamed circumstances." *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1374 (Fed. Cir. 2022) (quoting *Devex*, 461 U.S. at 656–57). And it is true that OWT did not accuse of Tennant of infringing the '415 patent when it reissued, but instead waited until 2019, for reasons that remain opaque. But Tennant has failed to show that this waiting period should be construed as the sort of "undue delay" necessary to deviate from standard practice under § 284.

In *Kaufman*, the Federal Circuit addressed a similar scenario in which the district court had adopted a later starting date for prejudgment interest, in part, because the plaintiff had waited for five years to sue on his patent. *Id.* at 1374. The Federal Circuit reversed, stating that "the fact that [plaintiff] did not sue for five years after he became aware of [defendant's] potential infringement does not alone justify a finding of undue delay." *Id.* at 1374–75. The court explained that delaying litigation for multiple years as a "litigation tactic" might warrant an undue finding, but also that "to show that delay was undue, a defendant must, at least generally, show that it was prejudiced." *Id.* at 1375; *see also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (finding that "undue delay" existed where a patentee engaged in "two

years" of "self-serving" "litigation tactics" before filing suit, which "resulted in prejudice to the defendants").

Here, Tennant suggests that the decision to wait until 2019 to assert infringement of the '415 patent was an undue delay tactic premised on OWT's desire to amass a stronger litigation position after the reissuance of the '092 and '665 patents. ECF 915 at 46. Waiting to buttress an infringement contention with new (and legitimate) patent claims does not seem to be the sort of "self-serving" "litigation tactic" that the *Kaufman* or *Crystal Semiconductor* courts contemplated. But even assuming that Tennant has pointed to a litigation tactic by OWT worthy of departing from the usual prejudgment interest standard, its argument still fails on prejudice. Nothing about Tennant's conduct with respect to OWT's infringement claims in this lawsuit suggests that it would have changed course had OWT approached earlier with only the '415 patent in hand. Indeed, Tennant made no effort to avoid or mitigate infringement even after this lawsuit was filed in 2020. Consequently, the Court calculates interest from the date of first infringement, in accordance with the usual practice under the Patent Act.

The parties also disagree on which interest rate the Court should apply. Section 284 does not specify the interest rate to be used, and '[a] variety of rates have been utilized by courts in patent cases, including statutory rates set by state statutes, the U.S. Treasury bill rate, the prime rate, the prime rate plus a percentage, and a rate on borrowed funds.'" *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. 11-cv-820 (JRT/HB), 2018 WL 3621206, at *21 (D. Minn. July 30, 2018), (quoting *Global Traffic Techs. LLC v. Emtrac*

*Sys., Inc.*, 2014 WL 1663420, at *15 (D. Minn. Apr. 25, 2014)) (alteration in *Schwendimann*), *aff'd*, 959 F.3d 1065 (Fed. Cir. 2020). OWT wants interest set at the Minnesota statutory rate. ECF 904 at 40. Tennant wants the Court to follow the prime borrowing rate. ECF 915 at 47. Here, the Court will adopt Minnesota's rate.

The relevant Minnesota statutory rate is 10% per year. *See* Minn. Stat. § 549.09(c)(2) (requiring an award of 10% prejudgment interest per year on state court judgments of over $50,000). Tennant seeks the lower prime rate, because Minnesota's rate is high over the time period at issue, and OWT shows no evidence that it would have borrowed money at the Minnesota statutory rate during the infringement period or invested royalties to receive the higher rate. ECF 915 at 47. OWT argues that it is not required to demonstrate that it borrowed money at the statutory rate, and contends that the evidence shows its board member was a "savvy business person who would have effectively deployed the capital from any royalty Tennant would have paid." ECF 933 at 29.

It is true that at least one court in this district has adopted the lower rate because of "the [significant] gap between (low) Treasury bill rates and (high) state statutory rates in recent years," especially where a patentholder has "presented no evidence that it borrowed moneys at a higher rate during the infringement period or that it would have invested the royalties at a higher rate." *Solutran*, 2019 WL 405513, at *28 (internal quotation omitted). But courts in this district routinely adopt the statutory rate in patent cases, both out of a desire for consistency and the belief that other rates have been too low to adequately meet the compensation required under § 284. *See Willis Elec. Co. v. Polygroup Ltd.*, No. 15-

CV-3443 (JNE/DTS), 2024 WL 1007893, at *3 (D. Minn. Mar. 8, 2024) ("Courts routinely award interest at the Minn. Stat. § 549.09 rate in patent infringement cases, and [defendant] has not presented sufficiently compelling reasons to depart from this standard practice."); *Schwendimann*, 2018 WL 3621206, at *22 (court "unpersuaded" by arguments to deviate from Minnesota's statutory rate) (internal quotations omitted and cleaned up). Here, the Court will follow the latter approach and adopt the statutory rate. Tennant has not advanced arguments sufficient for the Court to deviate from this norm.

### D. Post-Judgment Interest

Pursuant to 28 U.S.C. § 1961(a), "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." "Such interest shall be calculated from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a) (footnote and probable typographical error omitted). "Post-judgment interest applies to both the amount awarded in damages and prejudgment interest." *Schwendimann*, 2018 WL 3621206, at *23 (citing *Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co.*, 735 F.3d 993, 1008 (8th Cir. 2013)). Accordingly, post-judgment interest in this case shall begin accruing upon entry of judgment in this case.

III.    **Order**

For the foregoing reasons, **IT IS HEREBY ORDERED that**

1.  Defendant's Motion for Judgment as a Matter of Law and for a New Trial [ECF 893] is **DENIED**.

2.  Plaintiff's Motion for Enhanced Damages, Attorney Fees, Interest, and Costs [ECF 902] is **GRANTED IN PART** and **DENIED IN PART**.

    a.  It is **GRANTED** to extent that the Court will enhance the jury's damages award of $9,815,595 by 30%, or $2,944,679, for a total award of $12,760,274.

    b.  It is further **GRANTED** to the extent that prejudgment interest shall be awarded at the Minnesota statutory rate from March 17, 2015 until the date that judgment is entered.

    c.  It is further **GRANTED** to the extent that post-judgment interest shall begin to accrue pursuant to 28 U.S.C. § 1961(a) upon entry of judgment and upon the final amount as set forth in that judgment.

    d.  It is further **GRANTED** to the extent that the Court determines that Plaintiff shall be entitled to its costs, pursuant to Fed. R. Civ. P. 54(d)(1), upon entry of judgment.

    e.  Plaintiff's motion is otherwise **DENIED**.

3.  On or before September 11, 2025, Plaintiff shall file proposed language for an entry of judgment, consistent with this opinion and order, including Plaintiff's calculation of the interest to be included in said judgment. On or before September 16, 2025, Defendant may file any objections to Plaintiff's proposal. Absent objections, the Court will enter judgment on September 17, 2025.

Date: September 3, 2025                    *s/ Katherine M. Menendez*
                                            Katherine M. Menendez
                                            United States District Judge